## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| CHRISTOPHER SOGHOIAN | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:11-cv-02203-ABJ |
| | ) |
| OFFICE OF MANAGEMENT | ) |
| AND BUDGET, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

_____

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff hereby moves for summary judgment, and opposes defendant's motion for summary judgment, pursuant to Fed. R. Civ. P. 56. The grounds for this motion are set forth in the memorandum submitted herewith.

May 25, 2012

Respectfully submitted,

/s/ Derek E. Bambauer
DEREK E. BAMBAUER
Massachusetts BBO No. 660289
122 Smith Street, #2
Brooklyn, NY 11201
Tel: (734) 748-3535

/s/ Scott A. Hodes
Scott A. Hodes
D.C. Bar 430375
Scott A. Hodes, Attorney at Law
P.O. Box 42002
Washington, DC 20015
Tel: (301) 404-0502

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | | |
|---|---|---|
| CHRISTOPHER SOGHOIAN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:11-cv-02203-ABJ |
| | ) | |
| OFFICE OF MANAGEMENT | ) | |
| AND BUDGET, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

_____

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SOGHOIAN'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO OMB'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND ................................................................ 2

  A. IPEC and the Copyright Alert System ............................................................................ 2

  B. FOIA Request and Litigation ......................................................................................... 3

STANDARD OF REVIEW ................................................................................................... 5

ARGUMENT ...................................................................................................................... 6

  I.    OMB IS OBLIGATED TO DISCLOSE ALL MATERIAL WITHHELD UNDER
     EXEMPTION 4 ............................................................................................................. 6

    A. The Improperly Withheld Material Is Not Commercial ................................................... 7

    B. The Improperly Withheld Material Is Not Confidential .................................................. 11

      1. The information at issue falls outside the *Critical Mass* holding ................................ 11

      2. OMB has failed to demonstrate either competition or harm ....................................... 15

  II. OMB IS OBLIGATED TO DISCLOSE ALL MATERIAL WITHHELD UNDER
     EXEMPTION 5 ............................................................................................................. 16

    A. IPEC's Policymaking Role Is Extraordinarily Limited, Narrowing Its Ability to Claim
     Exemption 5 ................................................................................................................. 18

    B. Describing French Law Is Not Policymaking ................................................................. 19

    C. Press Releases Are Not Policymaking ........................................................................... 20

    D. The Joint Strategic Plan Materials Must Be Disclosed, At Least In Part ....................... 22

CONCLUSION ................................................................................................................... 27

## TABLE OF AUTHORITIES

**CASES**................................................................................................................**PAGES**

*Adionser v. Dept. of Justice,*
811 F. Supp. 2d 284, 297 (D.D.C. 2011) ................................................. 30

*Anderson v. Liberty Lobby,*
477 U.S. 242, 247-48 (1986) ...................................................................... 6

*Assassination Archives & Research Ctr. v. Cent. Intelligence Agency,*
334 F.3d 55, 57 (D.C. Cir. 2003) ........................................................ 6, 21

*Capitol Records v. Thomas-Rasset,*
2009 U.S. Dist. LEXIS 50075 at *1-10 (D. Minn. 2009) ........................ 11

*Carducci v. Regan,*
714 F.2d 171, 177 (D.C. Cir. 1983) .......................................................... 13

*Coastal States Gas Corp. v. Dept. of Energy,*
617 F.2d 854, 858n.2 (D.C. Cir. 1980) .......................... 19, 20, 21, 25

*Critical Mass Energy Project v. Nuclear Regulatory Comm'n,*
830 F.2d 278, 281 (D.C. Cir. 1987) ............................................................ 9

*Critical Mass Energy Project v. Nuclear Regulatory Comm'n,*
975 F.2d 871, 874 (D.C. Cir. 1992) .................................... 9, 12, 13, 14

*Dep't of Air Force v. Rose,*
425 U.S. 352, 361 (1976) ...................................................................... 6, 21

*Dudman Commc'ns Corp. v. Dept. of Air Force,*
815 F.2d 1565 (D.C. Cir. 1987) ................................................................ 29

*Estate of Parsons v. Palestinian Auth.,*
651 F.3d 118, 137 (D.C. Cir. 2011) .......................................................... 12

*Fischer v. Dep't of Justice,*
723 F. Supp. 2d 104, 110 (D.D.C. 2010) .................................................. 12

*Gallant v. Nat'l Labor Relations Bd.,*
26 F.3d 168, 171 (D.C. Cir. 1994) ....................................................... 7, 28

*Hodge v. Federal Bureau of Investigation,*
764 F. Supp. 2d 134 (D.D.C. 2011) .......................................................... 30

*Hughes Aircraft Co. v. Schlesinger,*
384 F. Supp. 292, 297 (C.D. Cal. 1974) ............................................ 14, 17

*John Doe Agency v. John Doe Corp.,*
493 U.S. 146, 151 (1989) ........................................................................... 21

*Johnson v. Exec. Office for U.S. Attys,*
310 F.3d 771, 776-77 (D.C. Cir. 2002) .................................................... 30

*Jordan v. Dept. of Justice,*
591 F.2d 753, 774 (D.C. Cir. 1978) .......................................................... 26

*Juarez v. Dept. of Justice,*
518 F.3d 54, 61 (D.C. Cir. 2008) .............................................................. 30

*Judicial Watch v. Export-Import Bank,*
108 F. Supp. 2d 19, 35 (D.D.C. 2000) ...................................................... 23

*Mayer, Brown, Rowe & Maw LLP v. Internal Revenue Serv.,*
537 F. Supp. 2d 128, 138-39 (D.D.C. 2008) ............................................ 25

*Mead Data Central v. Dept. of the Air Force*,
566 F.2d 242, 251 (D.C. Cir. 1977) ................................................................................. 21, 28
*Military Audit Project v. Casey*,
656 F.2d 724, 738 (D.C. Cir. 1981) ............................................................................................ 7
*Moore v. Aspin*,
916 F. Supp. 32, 35 (D.D.C. 1996) ........................................................................................... 28
*Nat'l Labor Rel. Bd. v. Sears, Roebuck & Co.*,
421 U.S. 132, 150-155 (1975) ........................................................................................ 19, 26, 27
*Nat'l Parks & Conservation Ass'n v. Kleppe*,
547 F.2d 673, 679 (D.C. Cir. 1976) ......................................................................................... 17
*Nat'l Parks & Conservation Ass'n v. Morton*,
498 F.2d 765, 766 (D.C. Cir. 1974) ...................................................................................... 8, 12
*Niagara Mohawk Power Corp. v. Dep't of Energy*,
169 F.3d 16, 18-19 (D.C. Cir. 1999) ....................................................................................... 17
*Paisley v. Cent. Intelligence Agency*,
712 F.2d 686, 698 (D.C. Cir. 1981) ......................................................................................... 20
*Potter v. D.C.*,
558 F.3d 542, 550 (D.C. Cir. 2009) ......................................................................................... 12
*Pub. Citizen Health Research Grp. v. Food & Drug Admin.*,
704 F.2d 1280, 1291 (D.C. Cir. 1983) ................................................................................. 17, 18
*Ryan v. Dept. of Justice*,
617 F.2d 781, 791 (D.C. Cir. 1980) ...................................................................................... 21, 28
*SafeCard Servs., Inc. v. Sec. & Exch. Comm'n*,
926 F.2d 1197, 1200 (D.C. Cir. 1991) ......................................................................... 7, 20, 27, 28
*Schlefer v. U.S.*,
702 F.2d 233, 237-43 (D.C. Cir. 1983) .................................................................................... 26
*Senate of the Commonwealth of P.R. v. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987)... 20,
  24
*Taxation with Representation Fund v. Internal Revenue Serv.*,
646 F.2d 666, 679 (D.C. Cir. 1981) ............................................................................... 22, 26, 27
*Twist v. Meese*,
854 F.2d 1421, 1425 (D.C.Cir.1988) ....................................................................................... 12
*U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*,
489 U.S. 749, 773 (1989) ........................................................................................................... 1
*Vaughn v. Rosen*,
523 F.2d 1136, 1145 (D.C. Cir. 1975) .................................................................................. 20, 23
*Wash. Post Co. v. Dep't of Health & Human Servs.*,
690 F.2d 252, 266 (D.C. Cir. 1982) ........................................................................................... 9
*Wilderness Soc'y v. U.S. Dep't of Interior*,
344 F. Supp. 2d 1, 14 (D.D.C. 2004) ....................................................................................... 25

**STATUTES**                                                         **PAGES**

15 U.S.C. § 8111 ........................................................................ 2, 22, 26, 27

15 U.S.C. § 8113 ................................................................................. 2, 22

17 U.S.C. §§ 512(a)-(c), (j) ..................................................................... 15

5 U.S.C. § 552 ............................................................................... passim

Pub. L. No. 110-403, 122 Stat. 4256 (2008) .............................................. 2

**OTHER AUTHORITIES** ...................................................................**PAGES**

*2011 U.S. Intellectual Property Enforcement Coordinator Annual Report on Intellectual*
*Property Enforcement* (Mar. 2012) ................................................. 15, 24

**RULES** ..................................................................................**PAGES**

Fed. R. Civ. P. 56(a) ............................................................................... 6

Local Civ. R. 7(m) ................................................................................. 5

**MEDIA** ..................................................................................**PAGES**

David Kravets, *ACTA Backs Away from Three Strikes*, <u>WIRED</u>, Apr. 21, 2010 ...................... 2, 8

David Kravets, *Copyright Treaty Is Policy Laundering at Its Finest*, <u>WIRED</u>, Nov. 4, 2009 ....... 3

Eric Pfanner, *France Adopts Wide Crackdown on Net Piracy*, <u>N.Y. Times</u>, Oct. 22, 2009 ........ 22

Greg Sandoval, *Exclusive: Top ISPs poised to adopt graduated response to piracy*, <u>CNET News</u>,
June 22, 2011 ................................................................................ 3, 16

Jason Mick, *Obama Conscripts ISPs as "Copyright Cops," Unveils "Six Strikes" Plan*,
<u>DailyTech</u>, July 8, 2011 ..................................................................... 3, 14

Sam Gustin, *Leaked document says EU fears Obama backs "three strikes" for Net pirates*, <u>Daily</u>
<u>Finance</u>, Nov. 30, 2009 ...................................................................... 3, 8

## INTRODUCTION

In summer 2012, millions of Americans will face a new "graduated response" system intended to educate them about on-line copyright infringement and, ultimately, to reduce that infringement. The graduated response system emerged from negotiations between content owners and Internet Service Providers ("ISPs"), with significant involvement by the administration of President Barack Obama. Plaintiff Christopher Soghoian ("Soghoian"), a noted privacy and security researcher, brings this suit under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, to vindicate Americans' right to know "what their Government is up to" – and, in particular, to understand what role the Intellectual Property Enforcement Coordinator ("IPEC") played in the putatively private agreement.[1] *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989).

Soghoian filed a FOIA request seeking disclosure of records related to the graduated response program from defendant Office of Management and Budget ("OMB"). OMB withheld certain responsive records under 5 U.S.C. §§ 552(b)(4) ("Exemption 4") and 552(b)(5) ("Exemption 5"). However, OMB has not sustained its burden of adequately justifying its failure to disclose these documents, and summary judgment should be granted for Soghoian.

---

[1] For example, Alec French of NBC Universal asked for assistance from IPEC with what he termed "the cajole set of issues." Def.'s Ex. 8, Redacted FOIA Documents, at OMB59 (letter from Alec French to Victoria Espinel).

## FACTUAL AND PROCEDURAL BACKGROUND

**A. IPEC and the Copyright Alert System**

In 2008, the "Prioritizing Resources and Organization for Intellectual Property Act of 2008" ("PRO-IP Act") was enacted. Pub. L. No. 110-403, 122 Stat. 4256 (2008). Title III of the PRO-IP Act established the IPEC, who is appointed by the President with the advice and consent of the Senate. 15 U.S.C. § 8111(a). IPEC's responsibilities involve reporting to Congress and the President regarding intellectual property ("IP") enforcement, coordinating the development of and (on request) assisting in the implementation of the Joint Strategic Plan against counterfeiting and infringement, facilitating policy guidance to agencies involved in IP enforcement, and chairing an interagency committee of these agencies. 15 U.S.C. § 8111(b)(1). The PRO-IP Act is careful to emphasize IPEC's limited scope of authority. 15 U.S.C. § 8111(b)(2); 15 U.S.C. § 8113(c). IPEC's role is to coordinate, advise, and assist – not to formulate policy itself. *Id.*

As part of its international intellectual property agenda, the Obama administration pressed for inclusion of "graduated response" provisions in the multi-lateral Anti-Counterfeiting Trade Agreement ("ACTA"). David Kravets, *ACTA Backs Away from Three Strikes*, WIRED, Apr. 21, 2010.[2] However, international opposition led to the removal of "graduated response," which would have required termination of the accounts of Internet users accused of IP infringement. *Id.* The administration moved instead to pressure ISPs and content owners to agree to a milder graduated response system, known as "Copyright Alerts." Greg Sandoval, *Exclusive: Top ISPs poised to adopt graduated response to piracy*, CNET News, June 22, 2011.[3] Victoria Espinel, the IPEC, has been closely involved in these efforts. Espinel Decl. ¶ 10. Media reports indicate that the Obama administration has used the threat of legislation to pressure ISPs to agree

---

[2] Available at http://www.wired.com/threatlevel/2010/04/acta-treaty/.

[3] Available at http://news.cnet.com/8301-31001_3-20073522-261/exclusive-top-isps-poised-to-adopt-graduated-response-to-piracy/#ixzz1Q8aI9e5j.

to adopt the Copyright Alerts system. Jason Mick, *Obama Conscripts ISPs as "Copyright Cops," Unveils "Six Strikes" Plan*, DailyTech, July 8, 2011.[4] Importantly, the administration seeks to gain through pressure on private parties that which it could not obtain through transparent, accountable negotiations with the Congress or with other nations. Kravets, *ACTA Backs Away from Three Strikes*, WIRED; Sam Gustin, *Leaked document says EU fears Obama backs "three strikes" for Net pirates*, Daily Finance, Nov. 30, 2009[5]; David Kravets, *Copyright Treaty Is Policy Laundering at Its Finest*, WIRED, Nov. 4, 2009[6].

## B. FOIA Request and Litigation

On June 23, 2011, Soghoian made the following FOIA request to OMB via e-mail:

> I request copies of all communications, documents and notes from meetings related to discussions between the Office of the U.S. Intellectual Property Enforcement Coordinator and any federal agency, the National Cable and Telecommunications Association (NCTA), AT&T, Verizon, Time Warner Cable, CableVision, Charter Communications, Comcast, and Qwest Communications, The Recording Industry Association of America (RIAA) and Motion Picture Association of America (MPAA), and any individual record and movie studios regarding "graduated responses" to subscriber copyright infringement.
>
> The scope of this request is for all records created between December 1, 2009 and June 22, 2011. If possible, I would like to receive the information in electronic format.

Def.'s Ex. 4, FOIA Request. OMB failed to respond to Soghoian's request within the statutorily-mandated twenty day period. 5 U.S.C. § 552(a)(6)(A); Def.'s Ex. 5, OMB Response to FOIA Request (OMB response dated Sept. 30, 2011). When OMB responded, it identified 205

---

[4] Available at
http://www.dailytech.com/Obama+Conscripts+ISPs+as+Copyright+Cops+Unveils+Six+Strikes+Plan/article22107.htm.

[5] Available at http://www.dailyfinance.com/2009/11/30/leaked-document-says-eu-fears-obama-backs-three-strikes-for-ne/.

[6] Available at http://www.wired.com/threatlevel/2009/11/policy-laundering.

pages responsive to the request; OMB withheld 60 pages in full or in part, and released 145.

Def.'s Ex. 5; Def.'s Ex. 7, OMB Response to Administrative Appeal. OMB sought to justify the

withholdings under Exemption 4, Exemption 5, and 5 U.S.C. § 552(b)(6) ("Exemption 6").

Soghoian submitted an administrative appeal over the withholdings on October 11, 2011. Def.'s

Ex. 6, Administrative FOIA Appeal. OMB again failed to respond to Soghoian's appeal within

the statutorily-mandated twenty day period. 5 U.S.C. § 552(a)(6)(A)(ii); Def.'s Ex. 7 (dated Dec.

19, 2011). Soghoian filed the present lawsuit on Dec. 12, 2011. Compl. For Injunctive Relief at

6.

On Dec. 19, 2011, OMB responded to the appeal, releasing parts of 15 pages withheld in

full, and additional portions of 3 pages withheld in part. OMB continued to withhold one page in

full under Exemption 5, and 59 pages in part under Exemptions 4, 5, and 6. *See* Def.'s Ex. 1,

*Vaughn* Index.

Presently before this Court is the dispute over five sets of withheld documents:

| *Vaughn* Index Numbers[7] | Description | Exemption Claimed by OMB |
|---|---|---|
| OMB2 | E-mail exchange regarding draft of graduated response system | 4 |
| OMB4-17, 19-32 | Drafts of Memorandum of Understanding outlining graduated response system | 4 |
| OMB33 | E-mail exchange regarding French on-line infringement law | 5 |
| OMB34, | E-mail exchanges discussing negotiations over | 5 |

---

[7] *See* Def.'s Ex. 1, *Vaughn* Index.

| 37-48 | Memorandum of Understanding and purported government response | |
| OMB35, 51-58 | E-mail exchanges and memos regarding Joint Strategic Plan against counterfeiting and infringement | 5 |

Attorneys for the parties have communicated on numerous occasions to attempt either to resolve or to narrow the dispute. *See* Local Civ. R. 7(m). For example, Soghoian has agreed not to contest the adequacy of OMB's search, not to pursue material withheld under Exemption 6, and not to challenge material categorized by OMB as non-responsive.[8] Soghoian now moves for summary judgment on all remaining issues.

## **STANDARD OF REVIEW**

A court may grant summary judgment where there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986). In FOIA cases, the government agency bears the burden of justifying its actions in withholding information, and the district court reviews the agency's actions de novo. 5 U.S.C. § 552(a)(4)(B); *Assassination Archives & Research Ctr. v. Cent. Intelligence Agency*, 334 F.3d 55, 57 (D.C. Cir. 2003). An agency must disclose records responsive to a request unless it can demonstrate that those records fall squarely within one of FOIA's exemptions – and those exemptions "must be narrowly construed." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976). Even if an exemption applies, the agency must

---

[8] These materials comprise redactions made to OMB Nos. 1, 2, 3, 18, 33, 35-38, 46, and 49-60. *See* Def.'s Ex. 1, *Vaughn* Index.

disclose "[a]ny reasonably segregable portion of a record" after exempt material is redacted. 5 U.S.C. § 552(b).

For a district court to grant summary judgment in a FOIA case based solely on information provided by an agency, such as via affidavits or declarations, those documents must meet three requirements: they must "describe the documents and the justifications for nondisclosure with reasonably specific detail"; "demonstrate that the information withheld logically falls within the claimed exemption"; and not be "controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). The affidavits, declarations, and *Vaughn* index provided by an agency must be "relatively detailed and non-conclusory." *SafeCard Servs., Inc. v. Sec. & Exch. Comm'n*, 926 F.2d 1197, 1200 (D.C. Cir. 1991); *Gallant v. Nat'l Labor Relations Bd.*, 26 F.3d 168, 171 (D.C. Cir. 1994).

## ARGUMENT

### I.    OMB IS OBLIGATED TO DISCLOSE ALL MATERIAL WITHHELD UNDER EXEMPTION 4

OMB claimed Exemption 4 as its basis for withholding one e-mail exchange between IPEC employees, ISP employees, and content company employees, and for withholding material from drafts of the Memorandum of Understanding eventually agreed to by the ISPs and content companies. The Memorandum of Understanding ("MoU") was signed by the Motion Picture Association of America ("MPAA"), the Recording Industry Association of America ("RIAA"), and by a number of individual motion picture, music, and ISP firms.[9] The MoU commits

---

[9] The final copy of the Memorandum of Understanding is available from the Center for Copyright Information, at http://www.copyrightinformation.org/sites/default/files/Momorandum%20of%20Understanding.pdf, and is submitted as Plaintiff's Exhibit 1.

signatories to implement a Copyright Alert system intended to educate Internet users about copyright infringement, and to deter them from infringing via penalties such as a reduction in Internet access speed, a mandated copyright education session, or temporary restrictions on access. Pl's Ex. 1, Memorandum of Understanding, ¶ 4(G)(ii) (describing Mitigation Measures). Though the final version of the MoU is publicly available, access to the drafts is important to the public to ascertain whether the initial, proposed graduated response system included elements such as disconnection or termination of accounts, similar to the proposed ACTA system. Kravets, *ACTA Backs Away from Three Strikes*, <u>WIRED</u>; Gustin, *Leaked document says EU fears Obama backs "three strikes" for Net pirates*, <u>Daily Finance</u>.

Exemption 4 permits an agency to withhold "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). OMB seeks to justify its failure to disclose information from the MoU drafts under the second prong of Exemption 4, which pertains to commercial or financial information. To qualify for the exemption, such material must meet three requirements: it is "(a) commercial or financial, (b) obtained from a person, and (c) privileged or confidential." *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 766 (D.C. Cir. 1974). The MoU drafts were concededly obtained from a person. *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 874 (D.C. Cir. 1992). However, the withheld information is neither commercial, nor privileged or confidential, and thus OMB must disclose it.

### A. The Improperly Withheld Material Is Not Commercial

The withheld information relates to voluntary efforts to educate Internet users about copyright infringement, and to discourage them from engaging in that behavior. It is not data about the MoU signatories' financial condition, sales statistics, or technological architectures. *Cf.*

*Wash. Post Co. v. Dept. of Health & Human Servs.*, 690 F.2d 252, 266 (D.C. Cir. 1982). Revelation of this information will not affect their profitability or ability to compete. *See Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 830 F.2d 278, 281 (D.C. Cir. 1987) (holding trade association reports "commercial" because information could impact profitability of association members). Indeed, the MoU signatories not only released later versions of the information publicly, they shared it with their competitors during the drafting stage.

OMB argues that disclosure "would give RIAA's competitors an unfair advantage in future copyright negotiations, and provide a 'road map' on how to engage more effectively in infringing activity." Def.'s Memorandum of Points and Authorities In Support of OMB's Motion for Summary Judgment ("OMB Memo") at 6. Both contentions are erroneous. First, the RIAA is a trade organization: it represents the interests of music labels and recording artists. Def.'s Statement of Material Facts In Support of OMB's Motion For Summary Judgment ("Def.'s Material Facts") ¶ 7; Sheckler Decl. ¶ 4. Neither OMB nor the RIAA (through the Sheckler Declaration) identifies any potential competitor to the RIAA. ISPs do not compete with music industry trade organizations. Labels or musicians do not compete with their representative association. And copyright infringers – the RIAA's "adversaries," in OMB's words – are hardly competitors for the organization or its constituents. *See* OMB Memo at 9-10. Bank robbers do not compete with banks. Infringers may harm copyright owners, but they do not compete with them.

Even if competition is analyzed from the perspective of RIAA members, such as Universal Music Group, there is no competitive harm. *See* Sheckler Decl. ¶ 8 (identifying Universal Music Group as RIAA member). Indeed, the individual members have disclosed this supposedly vital information to their closest competitors. Universal Music Group competes

8

directly with Warner Music Group, yet both had access to this purportedly commercial
information. *See* Pl's Ex. 1, Memorandum of Understanding, ¶ 1 (listing parties to the
agreement). The withheld information is not commercial in nature because it concerns voluntary
copyright education efforts; because its revelation poses no risk of competitive harm; and
because neither OMB nor the RIAA can even identify a potential competitor who would benefit
from its disclosure.

Second, OMB does not describe how the withheld information provides a "road map" for
infringers. Information about "the potential costs or allocations of risk associated with the
proposed Copyright Alert Program," or unspecified "opinions or recommendations" will confer
no advantage upon Internet users that infringe copyright. OMB Memo at 5-6; Sheckler Decl. ¶ 9;
*see generally Capitol Records v. Thomas-Rasset*, 2009 U.S. Dist. LEXIS 50075 at *1-10 (D.
Minn. 2009) (describing how defendant engaged in copyright infringement using peer-to-peer
file sharing program, and how plaintiff record company detected the infringement). Even the
Copyright Alert Program itself does not directly impede unlawful file sharing or other forms of
infringement; instead, it seeks to educate users about unlawful behavior. *See* Pl's Ex. 1,
Memorandum of Understanding, ¶¶ 3, 4(G). Infringement will occur, or not, regardless of who
bears the costs of user education. The MoU is strikingly, deliberately short on the technological
details that infringers would need to evade detection or engage in circumvention; architectural
decisions are at the discretion of signatory ISPs. *See* Pl's Ex. 1 at ¶¶ 4(G)(ii) (allowing
Acknowledgement Step Copyright Alert in "such other format as determined in the Participating
ISP's reasonable judgment); 4(G)(iii) (allowing "such other temporary Mitigation Measure as
may be applied by the Participating ISP in its discretion that is designed to be comparable to
those Mitigation Measures described above"). OMB does not specify adequately how disclosing

the withheld information will enable infringement, and it cannot do so – data about risks and costs has no effect on users who download files illegally.

In short, OMB must divulge the withheld information because it is not commercial, and thus does not fall within Exemption 4.

**B. The Improperly Withheld Material Is Not Confidential**

Furthermore, the withheld information is not "confidential," and thus does not qualify for

Exemption 4. The canonical test for confidentiality is whether disclosure would impair the

government's ability to obtain information in the future, or whether disclosure would cause

substantial competitive harm to the submitter. *Nat'l Parks & Conservation Ass'n*, 498 F.2d at

770. Where commercial information is submitted voluntarily to the government, it is confidential

"if it is of a kind that would customarily not be released to the public" by the submitter. *Critical*

*Mass*, 975 F.2d at 879. The material withheld by OMB must be evaluated under the *National*

*Parks* standard, as it does not meet the narrow requirements to be assessed under the *Critical*

*Mass* methodology. And, applying *National Parks* shows that the disclosure will not cause

substantial competitive harm to the RIAA.[10] Thus, the withheld material does not qualify for

Exemption 4, and must be divulged.

**1. The information at issue falls outside the *Critical Mass* holding**

In *Critical Mass*, the operators of U.S. nuclear power plants (via a non-profit trade

organization) voluntarily provided the Nuclear Regulatory Commission ("NRC") with reports

detailing the construction and operation of their plants. *Critical Mass*, 975 F.2d at 874. Critical

_____

[10] OMB does not argue that disclosure would impede the government's ability to obtain this type
of information in the future in its motion for summary judgment, and thus has waived this issue.
*See Fischer v. Dep't of Justice*, 723 F. Supp. 2d 104, 110 (D.D.C. 2010) (holding that plaintiff
conceded arguments under FOIA exemptions by failing to raise them in motion); *Potter v. D.C.*,
558 F.3d 542, 550 (D.C. Cir. 2009) (stating "the district court is not 'obliged to sift through
hundreds of pages of depositions, affidavits, and interrogatories in order to make [its] own
analysis and determination of what may, or may not, be a genuine issue of material disputed
fact'" (quoting *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C.Cir.1988))); *Estate of Parsons v.
Palestinian Auth.*, 651 F.3d 118, 137 (D.C. Cir. 2011) (Tatel, J., concurring) (stating that "[t]o
deny a summary judgment motion based on an evidentiary theory the nonmoving party never
developed would necessarily deprive the moving party of the opportunity to poke holes in that
theory"); *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (stating "where counsel has
made no attempt to address the issue, we will not remedy the defect").

Mass Energy Project ("CMEP") sought copies of the reports from NRC under FOIA. *Id.* NRC

denied the request under Exemption 4, and CMEP sued. *Id.* at 874-75. The D.C. Circuit, sitting

en banc, re-affirmed the *National Parks* methodology for Exemption 4, but announced a

different framework for information voluntarily submitted to the government. *Id.* at 875-78.

Thus, "financial or commercial information provided to the Government on a voluntary basis is

'confidential' for the purpose of Exemption 4 if it is of a kind that would customarily not be

released to the public by the person from whom it was obtained." *Id.* at 879.

     *Critical Mass* seems to create a clear rule, on which OMB relies heavily. OMB Memo at

8-9. However, the withheld information does not qualify for treatment under the *Critical Mass*

rule, for three reasons.

     First, OMB has failed to "meet the burden of proving the provider's custom." *Critical*

*Mass*, 975 F.2d at 879. The Sheckler declaration is entirely conclusory: it merely restates that the

information is confidential, without explaining why in any detail. Sheckler Decl. ¶ 10. The

declaration tries to assert, as justification for custom, the risks of disclosure to "competitors and

adversaries"; these sparse arguments fail for the reasons outlined above. The participants have

already disclosed this information to their competitors, and the data cannot help "adversaries"

such as users who infringe on-line. *See Hughes Aircraft Co. v. Schlesinger*, 384 F. Supp. 292,

297 (C.D. Cal. 1974) (finding that Hughes' revelation of salary data to competitors "challenges

the claim that Hughes is really worried about its competitive position" and ordering disclosure).

OMB emphasizes, as it must under *Critical Mass*, the risk that disclosure will "injure the

provider's interest." *Critical Mass*, 975 F.2d at 879. This is because the primary concern raised

by *Critical Mass* – that "persons whose confidences have been betrayed will, in all likelihood,

refuse further cooperation" – is one that OMB has chosen not to raise. *Id.* at 878. Thus, OMB has

not met its burden of showing that this type of information is customarily not released.

Second, the submissions are not voluntary: they are part of a quid pro quo. Media reports

indicate that the administration, including IPEC, has been pressuring ISPs to agree to the

Copyright Alerts program. Mick, *Obama Conscripts ISPs as "Copyright Cops,"* <u>DailyTech</u>.

Information in the material disclosed by OMB lends credence to this assertion, as do public

statements by IPEC Espinel. For example, an NBC Universal employee asked for a discussion

with Espinel and other IPEC employees about what he called "the cajole set of issues." Def.'s

Ex. 8, Redacted FOIA Documents, at OMB59 (letter from Alec French to Victoria Espinel).

Moreover, IPEC has emphasized its goal of pushing for additional agreements among private

parties to reduce infringement. *2011 U.S. Intellectual Property Enforcement Coordinator Annual*

*Report on Intellectual Property Enforcement* (Mar. 2012) ("2011 IPEC Report") at 1, 5-7 (noting

that "IPEC continues to encourage adoption of best practices agreements").[11] Private firms do

not share information with the government unless there is a benefit to doing so. Here, the

submissions by RIAA and Universal Music Group are one half of a bargain: in exchange for

IPEC pressing ISPs for additional steps to combat copyright infringement (steps they are not

legally obligated to take[12]), content owners shared information about negotiating positions and

discussions. The information shared with IPEC comes from only one side of the negotiations –

that of the content owners. Indeed, the ISPs' position was shared with IPEC indirectly: it was

sent by a Universal Music employee to IPEC. Def.'s Ex. 8, Redacted FOIA documents at 2 (e-

---

[11] Available at
http://www.whitehouse.gov/sites/default/files/omb/IPEC/ipec_annual_report_mar2012.pdf.
[12] 17 U.S.C. §§ 512(a)-(c), (j). Indeed, the MoU acknowledges that ISPs are not liable for the
infringing activities of their users, and that lack of participation "does not and is not intended to
establish any legal inference." Pl's Ex. 1 at 9n1.

mail from Matthew Gerson to Victoria Espinel).[13] Lastly, the ISP document makes plain exactly

what Soghoian argues, which is that this MoU was dependent upon "buy-in by policymakers."

Def.'s Ex. 8, Redacted FOIA documents at 2 (e-mail from Howard Symons to Cary Sherman).

Finally, this information *is* routinely disclosed to the public, by way of leaks to news

media. For example, reporter Greg Sandoval published a story with details about how the

Copyright Alert system would work, who would pay for it, and who would participate several

weeks in advance of the official announcement of the agreement.[14] Sandoval, *Exclusive: Top*

*ISPs poised to adopt graduated response to piracy*, CNET News (describing the "graduated

response" system, naming known ISP and content owner participants, and stating that "ISPs and

copyright owners will share the costs of operating the program, sources said"). Sandoval stated

that "multiple sources told CNET" about the deal, noting that the deal "represents a major

victory for the film and music industries." *Id.* While Sandoval does not name his sources, it is

unlikely that ISPs would so characterize the negotiations. It is disingenuous for content owners

first to leak details about the discussions to the public, and then to claim that this information is

not routinely disclosed.

Simply put, the *Critical Mass* test is not applicable in this situation, where OMB has not

proved industry custom, where the information is submitted as quid pro quo for government

pressure in negotiations, and where the information is deliberately leaked to the public.

---

[13] Umusic.com, the domain name from which Gerson sent his e-mail, resolves to Universal Music Group's Web site. *See* umusic.com.

[14] The agreement was announced officially on July 7, 2011. *See, e.g.,* RIAA, *Music, Movie, TV and Broadband Leaders Team to Curb Online Content Theft*, July 7, 2011, *available at* http://bit.ly/pdrdSF.

## 2. OMB has failed to demonstrate either competition or harm

OMB's withholding of the Exemption 4 material also is not justified under the *National Parks* standard. OMB has not demonstrated either that the RIAA and its members face competition regarding this information, nor that they face harm from its disclosure.

OMB must prove two elements under the *National Parks* test: first, that the submitter "actually face[s] competition," and second, that "substantial competitive injury would likely result from disclosure." *Nat'l Parks & Conservation Ass'n v. Kleppe*, 547 F.2d 673, 679 (D.C. Cir. 1976); *Niagara Mohawk Power Corp. v. Dep't of Energy*, 169 F.3d 16, 18-19 (D.C. Cir. 1999). For the second element, "[c]onclusory and generalized allegations of substantial competitive harm… are unacceptable." *Pub. Citizen Health Research Grp. v. Food & Drug Admin.*, 704 F.2d 1280, 1291 (D.C. Cir. 1983). Competitive injury is "harm flowing from the affirmative use of proprietary information *by competitors*." *Id.* at 1291n.30 (emphasis in original). OMB does not sustain its burden on either element of the *National Parks* test.

First, as described above, OMB has not demonstrated that RIAA and its members, such as Universal Music Group ("UMG"), face competition related to the withheld information. UMG has already disclosed this information to its competition – other record labels, such as Warner Music Group – during the course of negotiations. *Hughes Aircraft Co.*, 384 F. Supp. at 297 (finding no competitive harm where putatively confidential information shared with competitors). And, music labels do not compete with ISPs, nor with copyright infringers.

Second, OMB does not prove that there is any risk of harm to submitters from disclosure, let alone substantial injury. OMB attempts to argue that disclosure will impede the RIAA's discussions with "other intermediaries and interested parties," resulting in substantial harm. OMB Memo at 10. The statement is utterly conclusory: it does not even identify what the RIAA considers an intermediary or interested party, and it fails to explain how disclosure will harm

15

either the trade organization or its interests. Conclusory and generalized allegations are insufficient to support withholding responsive information. *Pub. Citizen Health Grp.*, 704 F.2d at 1291. OMB also fails to establish that the harm is substantial, particularly in light of the publication of the final MoU, the assistance of IPEC to the content owners, and the voluntary nature of the agreements at issue. *See* Sheckler Decl. ¶ 8 (describing "voluntary practices to deter certain forms of online infringement"). Finally, the suggestion that disclosure will enable adversaries to more effectively engage in copyright infringement is utterly without basis. OMB Memo at 10-11. Information on risks, costs, and legal opinions is of no utility to infringers. The MoU does not disclose (and OMB has not claimed that it has withheld) details of the technical architecture used to detect infringement. And, the Copyright Alerts system does not directly impede infringement techniques such as peer-to-peer file sharing or attempts to evade detection such as the use of virtual private networks and proxy servers.

In short, OMB has not sustained its burden to show that the withheld material properly falls within Exemption 4.

## II. OMB IS OBLIGATED TO DISCLOSE ALL MATERIAL WITHHELD UNDER EXEMPTION 5

OMB claimed Exemption 5 as its basis for withholding communications among government employees over the MoU, over the Joint Strategic Plan, and over France's law treating on-line infringement. Def.'s Ex. 1, *Vaughn* Index, at OMB33-35, 37-48, 51-58. However, OMB has failed to show that any of these materials fall within the ambit of Exemption 5's protections for the deliberative privilege, and hence must disclose them.

Exemption 5 permits the government to withhold "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The exemption "rel[ies] on discovery and

evidentiary privileges," and in particular "the attorney-client privilege, attorney work-product privilege, and the deliberative function, or executive, privilege." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 858n.2 (D.C. Cir. 1980). OMB asserts only the deliberative function privilege as grounds for withholding material under Exemption 5. OMB Memo at 12.

Exemption 5 covers only pre-decisional materials – those that are part of the deliberative, decision-making processes of government. *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150-155 (1975). Post-decisional documents are not protected by Exemption 5. *Id.* A pre-decisional document is ineligible for Exemption 5 "if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public." *Coastal States Gas Corp.*, 617 F.2d at 866. The agency bears the burden of proving the pre-decisional nature of withheld documents. *Id.* at 868. Thus, "to approve exemption of a document as predecisional, a court must be able 'to pinpoint an agency decision or policy to which the document contributed.'" *Senate of the Commonwealth of Puerto Rico v. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987) (quoting *Paisley v. Cent. Intelligence Agency*, 712 F.2d 686, 698 (D.C. Cir. 1981)).

An agency may only assert Exemption 5 for material that "makes recommendations or expresses opinions on legal or policy matters"; the information must "be a part of the agency give-and-take of the deliberative process by which the decision itself is made." *Vaughn v. Rosen*, 523 F.2d 1136, 1145 (D.C. Cir. 1975). And, the agency must explain its decision-making process in sufficient detail to establish that the withheld material is in fact pre-decisional. *Safecard Servs.*, 926 F.2d at 1204. OMB's suggestion that agencies be accorded "considerable deference" in determining what materials fall within the deliberative process is in significant tension with FOIA's purpose, and with prior precedent in this Circuit. *See, e.g., Vaughn*, 523 F.2d at 1145-46

17

(rejecting government's "characterization of this mass of material it seeks to protect as the 'deliberative process'" and noting "[i]f we construed Exemption 5 as broadly as the Government seeks to do here, we would go a long way toward undercutting the entire Freedom of Information Act"); *Rose*, 425 U.S. at 361 (stating exemptions "must be narrowly construed"); *Assassination Archives*, 334 F.3d at 57 (noting FOIA requires de novo, not deferential, review of agency withholdings); *Mead Data Cent. v. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977) (stating that "[i]n a FOIA action the district court is not limited to review of the quality of agency decisionmaking… the agency's opinions carry no more weight than those of any other litigant"); *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151 (1989) (noting FOIA's basis in the "fundamental principle of public access to Government documents").

Lastly, Exemption 5 applies to opinion, not facts. *Coastal States Gas Corp.*, 617 F.2d at 867 (stating that "the privilege applies only to the 'opinion' or 'recommendatory' portion of the report, not to factual information"). Factual material can be withheld from disclosure only if it is "inextricably intertwined" with decisionmaking, or if "the manner of selecting or presenting those facts would reveal the deliberate process." *Ryan v. Dept. of Justice*, 617 F.2d 781, 791 (D.C. Cir. 1980) (omitting internal footnotes).

## A. IPEC's Policymaking Role Is Extraordinarily Limited, Narrowing Its Ability to Claim Exemption 5

IPEC's ability to avoid disclosing material under Exemption 5 is narrow, because IPEC's decision-making authority is narrow. *See Taxation with Representation Fund v. Internal Revenue Serv.*, 646 F.2d 666, 679 (D.C. Cir. 1981) (emphasizing "nature of the decisionmaking authority vested in the office or person issuing the disputed document" in assessing the deliberative process privilege). The agency's policymaking ambit is deliberately limited by the PRO-IP Act;

IPEC is principally a coordinating body, and is prevented from directing or controlling law enforcement agencies in their "exercise of [their] investigative or prosecutorial authority." 15 U.S.C. § 8111(b). While IPEC "may consult with private sector experts in intellectual property enforcement," that consultation is directed to "providing assistance to the members of the advisory committee" that develops the Joint Strategic Plan against counterfeiting and infringement – not to assisting private entities in private negotiations. 15 U.S.C. § 8113(c)(2). In short, IPEC makes few decisions and sets little policy, greatly limiting what it can refuse to disclose under Exemption 5.

### B. Describing French Law Is Not Policymaking

OMB has withheld part of one e-mail message from IPEC Espinel regarding France's adoption of a law intended to reduce on-line IP infringement through fines and mandatory disconnection of users accused of infringement.[15] Espinel Decl. ¶ 15; *see generally* Eric Pfanner, *France Adopts Wide Crackdown on Net Piracy*, N.Y. Times, Oct. 22, 2009[16]. This information does not fall within Exemption 5 because it is not related to any deliberative process.

OMB's characterization of the withheld information is telling, and fatal to its claim. The *Vaughn* index states that the information in the e-mail was intended to "properly characterize [France's] approach." Def.'s Ex. 1, *Vaughn* Index, at 4 (describing OMB33). Describing French law accurately is not a policy decision. IPEC Espinel seeks to characterize the information as related to "the Administration's response to an ongoing policy issue." Espinel Decl. ¶ 15. She does not identify that policy issue, because she cannot: there is no subjective or political judgment involved in accurately characterizing the status of French law. *Cf. Vaughn*, 523 F.2d at

---

[15] This document is OMB33. *See* Def.'s Ex. 1, *Vaughn* Index.
[16] Available at http://www.nytimes.com/2009/10/23/technology/23net.html?_r=1.

1144 (stating that "[u]nevaluated factual reports or summaries of past administrative determinations are frequently used by decisionmakers in coming to a determination, and yet it is beyond dispute that such documents would not be exempt from disclosure" (internal footnote omitted)). Even if an agency does not identify a specific decision that undergirds a withholding, it must at least identify that it is decisional. *Judicial Watch v. Export-Import Bank*, 108 F. Supp. 2d 19, 35 (D.D.C. 2000). OMB fails to do so. Describing French law correctly does not involve a decision, unless misdescribing it is an option. Thus, OMB must disclose the remainder of this e-mail.

### C. Press Releases Are Not Policymaking

OMB has refused to disclose a set of materials related to the MoU and the negotiations among content owners and ISPs over it.[17] OMB's arguments regarding these documents are long on quotations about the importance of protecting deliberative material, but remarkably short on descriptions of what the supposed deliberations at issue here are. *See* OMB Memo at 13-15. Neither OMB nor IPEC has identified any decision that IPEC took, or contemplated taking, regarding these materials. Indeed, the absence of any such decision or deliberation is highlighted by IPEC's own characterization of the negotiations between content owners and ISPs. IPEC's 2011 Annual Report on Intellectual Property Enforcement refers repeatedly to "voluntary best practices by the private sector," to "a voluntary agreement [that] was finalized among several Internet Service Providers… and major and independent music labels and movie studios," to "cooperative voluntary agreements," to "private sector arrangements," and to "voluntary agreements and best practices." 2011 IPEC Report at 1, 5-6. IPEC does not set policy for private agreements. The agency's own materials emphasize that measures such as the Copyright Alerts

---

[17] These materials are OMB34, 37-48. *See* Def.'s Ex. 1, *Vaughn* Index.

Program are the result of voluntary private bargains, not government regulation or fiat. Where an agency has no power to decide, it cannot withhold under Exemption 5.

OMB attempts to characterize the deliberative process here as related to an Administration "response" to the negotiations. This argument has two shortcomings. First, OMB fails to describe what response, if any, occurred (or even failed to occur). The agency bears the burden of showing that the materials are pre-decisional. *Senate of the Commonwealth of P.R.*, 823 F.2d at 585; *Coastal States Gas Corp.*, 617 F.2d at 868. OMB implies that the administration response involved public communication, but press releases are not policy. *See, e.g.,* Def.'s Ex. 8, Redacted FOIA Docs, at OMB34 (e-mail from Victoria Espinel describing her "attempt to turn [administration's] principles into prose"; e-mail from Stanford McCoy to Victoria Espinel, suggesting she "consider providing an 'if asked' response"). If government reflections or descriptions of private sector events, without any lawful decisionmaking role in them, were to qualify for Exemption 5, the exemption would swallow the FOIA rule. *See Mayer, Brown, Rowe & Maw LLP v. Internal Revenue Serv.*, 537 F. Supp. 2d 128, 138-39 (D.D.C. 2008) (requiring disclosure of press releases "because they do not 'bear on the policy formulation' involved" (quoting *Wilderness Soc'y v. U.S. Dep't of Interior*, 344 F. Supp. 2d 1, 14 (D.D.C. 2004))).

Even if one were to assume that IPEC's "response" to private negotiations constituted policy, the withheld materials would still not qualify for Exemption 5. These documents contain a discussion of "appropriate general principles" to inform such a response. *See, e.g.,* Def.'s Ex. 1, *Vaughn* Index, at 4 (describing OMB34). OMB has failed to articulate where these general principles can be found. Absent such information, either the withheld material is not pre-decisional, or it constitutes a body of "secret law" regarding how such responses are shaped. Principles that determine what policy IPEC adopts regarding private agreements, unless publicly

available, "constitute the 'working law' of the agency and have been held by the lower courts to

be outside the protection of Exemption 5." *Sears, Roebuck & Co.,* 421 U.S. at 152-54 (omitting

internal citations and footnote); *accord Taxation With Representation Fund*, 646 F.2d at 678. If

IPEC has no decisionmaking authority in this area, Exemption 5 does not apply because the

materials are not pre-decisional. If it does have authority, it must divulge the information to

ensure the public knows how determinations will be made. *See Schlefer v. U.S.*, 702 F.2d 233,

237-43 (D.C. Cir. 1983); *Jordan v. Dept. of Justice*, 591 F.2d 753, 774 (D.C. Cir. 1978).

### D. The Joint Strategic Plan Materials Must Be Disclosed, At Least In Part

Lastly, OMB has withheld documents related, according to its *Vaughn* index, to the Joint

Strategic Plan ("JSP") against counterfeiting and infringement.[18] The documents do not qualify

for Exemption 5 because IPEC coordinates development of the JSP – it does not have authority

to craft the measure itself. And even if some of the withheld materials were to qualify under

Exemption 5, OMB has failed to assess – as it must – whether any of the redacted information

was eventually incorporated into the final JSP, or whether any of the withheld material is factual.

In both cases, OMB must disclose the information.

OMB does not develop IP policy. It assists others to do so. This is clear from the text of

the PRO-IP Act. *See* 15 U.S.C. § 8111(b)(1)(B) ("IPEC shall… coordinate the development of

the Joint Strategic Plan against counterfeiting and infringement by the advisory committee").

Critically, it is not IPEC that develops the JSP; it is the advisory committee consisting of a

congeries of other executive branch agencies that does so. 15 U.S.C. § 8111(b)(3)(A) (listing

committee members). IPEC merely coordinates and chairs those efforts. *Id.* Where IPEC lacks

---

[18] These materials are OMB35, 51-58. *See* Def.'s Ex. 1, *Vaughn* Index.

decisionmaking authority, it cannot claim the deliberative privilege for allegedly pre-decisional materials. *Taxation with Representation Fund*, 646 F.2d at 679.

Even if one assumes that IPEC does have decisionmaking authority regarding the JSP, OMB has failed to demonstrate that it has released non-exempt material. First, information from the withheld documents that was incorporated into the final JSP (which is publicly available) must be disclosed. 5 U.S.C. §§ 552(a)(2)(A), 552(a)(2)(B) (requiring agencies to disclose "final opinions, including concurring and dissenting opinions, as well as orders, made in the adjudication of cases" and "those statements of policy and interpretations which have been adopted by the agency and are not published in the Federal Register"); *Sears, Roebuck & Co.*, 421 U.S. at 153-54; *SafeCard Servs.*, 926 F.2d at 1203-04 (noting that *Sears* removed "any document adopted by, or expressly incorporated into [final agency action]… from the scope of the deliberative process principle"). OMB's *Vaughn* index, and IPEC Espinel's declaration, fail to prove – or even assert – that OMB has disclosed all such material. *See* Def.'s Ex. 1, *Vaughn* Index, at OMB35, 51-58; Espinel Decl. ¶¶ 14, 16-23. OMB bears the burden of showing that it has affirmatively complied with its FOIA obligations. 5 U.S.C. § 552(a)(4)(B); *Moore v. Aspin*, 916 F. Supp. 32, 35 (D.D.C. 1996).

Second, OMB has not met its burden of demonstrating that the withheld documents are free of segregable factual material. Indeed, IPEC Espinel's declaration deliberately hedges on this issue: she states that "the recitation of specific 'facts' in these documents itself reflects the subjective judgment of the document's author… the very confirmation of their selection for the reader's attention would reflect the judgment of the author as to their relative importance." Espinel Decl. ¶ 22. This interpretation would eviscerate the statutory requirement to disclose segregable factual information – any document includes a subset of facts selected by its author

23

from the larger world. 5 U.S.C. § 552(b) (requiring that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection"); *Ryan*, 617 F.2d at 790-91 (stating "factual material which is severable from the policy advice contained in a document, and which would not compromise the confidential remainder of the document, must be disclosed"); *Mead Data Cent.*, 566 F.2d at 260. Conclusory allegations regarding disclosure of segregable information are not sufficient to meet an agency's burden. *SafeCard Servs.,* 926 F.2d at 1200; *Gallant*, 26 F.3d at 171. Indeed, agency claims that material is non-segregable are held to the same standard of specificity required for claims of exemption from FOIA itself. *Mead Data Cent.*, 566 F.2d at 260-62 (noting that "[r]equiring a detailed justification for an agency decision that non-exempt material is non-segregable will not only cause the agency to reflect on the need for secrecy and improve the adversarial position of FOIA plaintiffs, but it will also enable the courts to conduct their review on an open record and avoid routine reliance on in camera inspection").

While it is possible for "the disclosure of even purely factual material [to] so expose the deliberative process" that it can be excused under Exemption 5, the standard for such a finding is high. *Id.* at 256. The agency must show that disclosure "would expose [its] decision making process in such a way as to discourage discussion within the agency and thereby undermine the agency's ability to perform its functions." *Dudman Commc'ns Corp. v. Dep't of Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987). Here, OMB has failed to satisfy that demanding standard. OMB claims that revealing *any* factual information contained in the redacted documents would compromise IPEC's functions because it would reveal which facts the author decided to include. This position is circular (by definition, disclosure reveals the author's choice of facts), and does not show impairment of IPEC's limited duties.

24

The only evidence that OMB musters to support its claims that factual disclosure would damage the deliberative process is IPEC Espinel's statement that "'factual' information is not reasonably segregable from the overall deliberative nature of these documents." Espinel Decl. ¶ 22. IPEC Espinel asks that the court take her word for the contention that there is no segregable material. *Id.*; OMB Memo at 18-19. Ironically, OMB itself notes that a court "may rely on government affidavits that show *with reasonable specificity* why documents withheld pursuant to a valid exemption cannot be further segregated." *Juarez v. Dep't of Justice*, 518 F.3d 54, 61 (D.C. Cir. 2008) (emphasis added). Espinel's conclusory statements are not specific.

The cases OMB cites to support for its position operate under far different circumstances: analysis of the privacy-related Exemption 7(C) in the case of a convicted felon[19]; analysis of another convicted felon's challenge to withholding of "a witness immunity request, handwritten attorney's notes, a warrant affidavit, a property list, a case timeline, and attorney correspondence" under Exemption 5[20]; and an analysis of a death row inmate's challenge to information withheld pursuant to 5 U.S.C. §§ 552(b)(3), (b)(6), (b)(7)(C), and (b)(7)(D)[21]. With due respect to the convicted criminals involved, their cases do not implicate the same concerns about governmental transparency and accountability as the instant lawsuit, and only one touches (tangentially) on Exemption 5.

To summarize: OMB has improperly withheld documents related to the JSP. IPEC's lack of decisionmaking authority for the JSP should compel their release in full. At minimum, this Court should order OMB to disclose all material incorporated in the final JSP, to disclose all

---

[19] *Johnson v. Exec. Office for U.S. Attys*, 310 F.3d 771, 776-77 (D.C. Cir. 2002); *see* OMB Memo at 18.
[20] *Adionser v. Dept. of Justice*, 811 F. Supp. 2d 284, 297 (D.D.C. 2011); *see* OMB Memo at 18.
[21] *Hodge v. Federal Bureau of Investigation*, 764 F. Supp. 2d 134 (D.D.C. 2011); *see* OMB Memo at 18-19.

segregable factual material, and to account with specificity for factual material that it claims cannot be segregated.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Soghoian's motion for summary

judgment, and deny defendant OMB's motion for summary judgment.


May 25, 2012                              Respectfully submitted,

                                          /s/ *Derek E. Bambauer*
                                          DEREK E. BAMBAUER
                                          Massachusetts BBO No. 660289
                                          122 Smith Street, #2
                                          Brooklyn, NY 11201
                                          Tel: (734) 748-3535

                                          /s/ *Scott A. Hodes*
                                          Scott A. Hodes
                                          D.C. Bar 430375
                                          Scott A. Hodes, Attorney at Law
                                          P.O. Box 42002
                                          Washington, DC  20015
                                          Tel: (301) 404-0502

                                          Attorneys for Plaintiff