**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

CHRISTOPHER SOGHOIAN      )
                                )
          Plaintiff,      )
                                )
          v.          )     Civil Action No. 1:11-cv-02203-ABJ
                                )
OFFICE OF MANAGEMENT     )
AND BUDGET,            )
                                )
                                )
          Defendant.    )
                                )

_____

## PLAINTIFF SOGHOIAN'S REPLY MEMORANDUM IN SUPPORT OF SOGHOIAN'S MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT OMB'S MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Defendant Office of Management and Budget ("OMB") has failed to sustain its burden under the Freedom of Information Act ("FOIA") for withholding information responsive to a request from Plaintiff Christopher Soghoian ("Soghoian") based on Exemptions 4 and 5 of FOIA. At best, OMB's arguments show disputed factual issues that warrant discovery, if not a full trial. However, the most logical conclusion is that OMB's contentions simply fail. Summary judgment should be granted to Soghoian.

## I.    OMB MUST DISCLOSE ALL MATERIAL WITHHELD UNDER EXEMPTION 4

Under Exemption 4, OMB withheld draft versions of a Memorandum of Understanding ("MoU") between Internet Service Providers ("ISPs") and content owners such as the Recording

Industry Association of America ("RIAA"), along with part of one e-mail discussing MoU

drafts. Dkt. 13-3, Def.'s Ex. 1, *Vaughn* Index ("OMB *Vaughn* Index"), OMB2, 4-17, 19-32.[1]

OMB has failed to meet its statutory burden for withholding these responsive materials. 5

U.S.C. § 552(a)(4)(B). OMB has not shown that the withheld information is either commercial or

confidential. Drafts of a voluntary initiative regarding copyright education are not commercial,

and OMB's arguments to the contrary are circular, belied by its own evidence, or simply

incorrect. Moreover, OMB has not shown that the drafts are confidential, particularly since they

were widely shared, including with journalists. Lastly, because the information was shared by

content owners with the Intellectual Property Enforcement Coordinator (IPEC) as part of a quid

pro quo for pressure on other stakeholders, OMB must demonstrate that disclosure would create

substantial competitive harm for the RIAA or its members. OMB's definition of "competition" is

too broad, and its evidence too weak, to carry that burden.


### A. The Improperly Withheld Material Is Not Commercial

OMB employs the term "commercial" in an overly broad, even circular fashion. OMB

cites a definition that information is commercial when its provider "has a commercial interest in

it." Dkt. 17, Def. OMB's Memorandum In Opposition to Cross Motion for Summary Judgment

("OMB Reply") 2-3 (citing *Baker & Hostetler LLP v. Dep't of Commerce*, 473 F.3d 312, 319

(D.C. Cir. 2006)). This circular definition fails to clarify what counts as commercial – but the

examples cited by the D.C. Circuit do, and they undercut OMB's position. As examples, the D.C.

Circuit pointed to nuclear safety data because the 'commercial fortunes' of member utilities

'could be materially affected'" by its disclosure; to health and safety data from lens

manufacturers that would be "instrumental in gaining marketing approval" from the Food and

---

[1] See Pl's Opposition Memo 4-5 for a table summarizing these withholdings.

Drug Administration; and letters about the lumber industry that "would help rivals identify and exploit those companies' commercial weaknesses." *Baker & Hostetler*, 473 F.3d at 319-20 (citing and quoting *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 830 F.2d 278, 281 (D.C. Cir. 1987), and *Pub. Citizen Health Research Grp. v. Food & Drug Admin.*, 704 F.2d 1280, 1290 (D.C. Cir. 1983)). OMB adduces no evidence that disclosure of the withheld information would materially affect the RIAA's commercial fortunes (or that of its members). OMB itself argues that the agency does not regulate the RIAA or record companies. OMB Reply 6. Lastly, RIAA does not have competitors (or at least identifies none), and its member record companies have already shared the information with their closest competitors – each other.[2]

OMB also advances the utterly implausible argument that the material is commercial because disclosure could "facilitate future copyright infringement." OMB Reply 3. OMB offers no rationale for believing that "potential *costs* or *allocations of risk*" could embolden or deter copyright infringers – because there is none. OMB Reply 3 (emphasis in original); *see* Dkt. 15, Pl.'s Memorandum in Opposition to Motion for Summary Judgment ("Pl's Opposition Memo") 9-10 (explaining why disclosure cannot provide a "road map" for infringement). However, the supplemental declaration of Victoria Sheckler ("Sheckler"), Senior Vice President for the RIAA, shows why OMB continues to advance this argument. Sheckler states that her contention that

---

[2] In its reply, OMB states that Soghoian's analysis of the lack of competitive harm that would accrue on disclosure confuses the prongs of the Exemption 4 test. OMB Reply 4-5. OMB misunderstands either Soghoian's argument or the applicable precedent. Competitive harm is entirely relevant to analysis of whether information is "commercial." Indeed, the case cited by OMB considers this factor. *Baker & Hostetler*, 473 F.3d at 319-20; *see also Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 93 F. Supp. 2d 1, 15-16 (D.D.C. 2000) (analyzing whether voluntarily submitted airbag data is commercial and discussing whether it "would allow a competitor to determine the direction of the company's past and current efforts in research and development" and finding that reverse-engineering the data "would not give competitors the detailed, compiled information that exists in the Intervenor-Defendants' responses"). Neither RIAA nor its members would suffer competitive harm from disclosure, cutting against a finding that the information is commercial.

"disclosure of the redacted provisions could be used as a 'road map' by those interested in

infringing activity… meant that those opposed to the Copyright Alert System ("CAS") could

unfairly and inaccurately describe and characterize the system." Dkt. 17-1, Supplemental

Declaration of Victoria Sheckler ("Sheckler Supp.") ¶6. OMB's purpose is not to protect RIAA's

confidential commercial information – it is to insulate the trade organization from criticism. And

it is well-settled that Exemption 4 may not be invoked to protect a submitter from embarrassment

or critique. *United Techs. Corp., Pratt & Whitney Div. v. U.S. Dep't of Def.*, 601 F.3d 557, 564

(D.C. Cir. 2010) (noting that "Exemption 4 does not guard against mere embarrassment in the

marketplace or reputational injury"). Criticism and public scrutiny are at the heart of FOIA,

particularly when the government seeks to involve itself in private negotiations for policy

reasons. *Envtl. Prot. Agency v. Mink*, 410 U.S. 73, 80 (1973); *2011 U.S. Intellectual Prop.*

*Enforcement Coordinator Annual Report on Intellectual Prop. Enforcement* (Mar. 2012) ("2011

IPEC Report") at 1, 5-7 (noting that "IPEC continues to encourage adoption of best practices

agreements).[3]

In short, the withheld information is not commercial; OMB defends it as such to protect

the RIAA and record companies not from market harm, but from public critique.


### B. The Improperly Withheld Material Is Not Confidential

OMB fails to establish that the withheld information is confidential. The conclusory

statements in the Sheckler supplemental declaration fail to controvert the evidence that the

withheld information was widely disclosed, even to the media, and thus OMB cannot show that

RIAA does not customarily disclose such information. At minimum, this Court should order

---

[3] Available at
http://www.whitehouse.gov/sites/default/files/omb/IPEC/ipec_annual_report_mar2012.pdf.

discovery to allow Soghoian to ascertain the extent of such sharing, any restrictions placed on its dissemination, and whether any of the record companies disclosed the information to the media. OMB fails to rebut *any* of Soghoian's evidence showing that the information was not disclosed voluntarily, but rather as part of a quid pro quo for IPEC assistance in advancing the content owners' position in the MoU negotiations. Lastly, OMB has not showed either that the RIAA or its members face relevant competition, or that they would face substantial injury from disclosure.

OMB has not proved, as it must to come within the ambit of *Critical Mass II*, that the information was not customarily disclosed to the public. *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 879 (D.C. Cir. 1992). Drafts of the MoU, and data about negotiations, were widely shared, but on this record, neither Soghoian nor this Court can determine how widely. OMB and Sheckler make much of the "DRAFT PRIVILEGED AND CONFIDENTIAL" language stamped on each page of the MoU drafts. However, this hardly proves that the information is confidential. Stamping information with a protective legend is routine; in the trade secret context, for example, it is but one factor in the analysis of whether data is sufficiently secret to obtain legal protection. *See* Roger M. Milgrim & Eric E. Bensen, *Milgrim on Trade Secrets* § 1.04 (2012) (describing documents legends as but one safeguard courts focus on to determine whether information is a trade secret); *Flotec v. S. Research*, 16 F. Supp. 2d 992, 1004-05 (S.D. Ind. 1998) (analyzing application of legend to engineering drawings as only one component of whether drawings constituted trade secrets). The key element is not how information is described – it is how it is disclosed. *Parker v. Bureau of Land Mgmt.*, 141 F. Supp. 2d 71, 79 (D.D.C. 2001) (emphasizing that "[d]istribution within the company of these withheld documents was on a limited 'need to know' basis to prevent public dissemination"). OMB offers no information about non-disclosure agreements or other protective measures taken

to ensure confidentiality of the drafts. Such "measures taken to ensure confidentiality" are critical to analysis of whether information is confidential under Exemption 4. *Cooper v. Dep't of Navy*, 2007 WL 1020343 at *5 (D.D.C. 2007).

Moreover, as Soghoian has established, information about drafts of the MoU was leaked to journalist Greg Sandoval under conditions favorable to the industry. Pl's Opposition Memo 14.[4] RIAA President Cary Sherman forwarded the article to Espinel via e-mail – without any expression of protest or concern. Pl's Exhibit 2 (e-mail from Cary Sherman to Victoria Espinel).[5] While the Sheckler declaration notes that RIAA did not leak the drafts, it does not make any such contention regarding RIAA *members*. Sheckler Supp. ¶ 7. Sheckler is careful to include RIAA members in other portions of her declaration. *Compare* ¶7 (stating "RIAA did not disclose the redacted provisions… RIAA also did not send these provisions to any reporters") *with* ¶6 (claiming "disclosure of the withheld information would likely cause competitive harm to RIAA *and its members*") and ¶8 (stating "RIAA *and its member* submitted the preliminary drafts of the MoUs to Ms. Espinel") (emphasis added).

OMB's claim that the information is confidential, because it was not disclosed to the public, is controverted both by press coverage of leaks of the MoU drafts and by Sheckler's

---

[4] OMB criticizes Soghoian for relying on published news to establish facts about the leak, terming it inadmissible hearsay. Plaintiff is at the disadvantage that characterizes FoIA litigation: he has neither access to the documents, nor defendant's special relationship with the RIAA, to aid him in making his case. *Cf. Vaughn v. Rosen*, 484 F.2d 820, 823-24 (D.C. Cir. 1975). Soghoian agrees that more direct evidence about the leak would be desirable; if OMB is offering to engage in discovery to bring more information about the leak into the record for this Court, Soghoian gladly accepts.
[5] This e-mail was disclosed to Soghoian by OMB in response to his FOIA Request. Sherman's e-mail address on the final page of the e-mail was redacted under Exemption 6. *See* OMB *Vaughn* Index, OMB1. To narrow the dispute, Soghoian offered not to challenge withholdings under Exemption 6.

careful hedging regarding whether RIAA members disclosed the documents.[6] Thus, Sheckler's

statement alone is insufficient to support the conclusion that the information is confidential.

Soghoian has gone well beyond "purely speculative claims" in controverting Sheckler's

affidavit. *Safecard Servs., Inc. v. Sec. & Exch. Comm'n*, 926 F.2d 1197, 1200 (D.C. Cir. 1991);

*McKinley v. Bd. of Governors of Fed. Reserve Sys.*, 2012 WL 1034464 at *10 (D.D.C. 2012). At

minimum, discovery is warranted to allow Soghoian to fully respond to OMB's factual claims

here.

Soghoian also argues, and OMB fails to refute, that the provision of information from

content owners, such as the RIAA, to IPEC is not voluntary, but instead is the price of obtaining

IPEC's assistance in the MoU negotiations. Thus, the information cannot be analyzed under the

more generous standard of *Critical Mass II* in terms of confidentiality, but must satisfy the more

demanding test of *National Parks. See Critical Mass Energy Project*, 975 F.2d at 879; *Nat'l*

*Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974).

OMB does not refute, or even contest, any of Soghoian's five specific contentions

regarding the trade of information for assistance. First, an NBC Universal executive asked for a

discussion with IPEC Victoria Espinel ("Espinel") regarding what he called "the cajole set of

---

[6] In its reply, OMB tries to resurrect an argument it failed to make in its summary judgment motion – that disclosure might impede the government's ability to obtain such information in the future – by arguing that such "common sense" positions need not be raised overtly. OMB Reply 8n.2. OMB neglects to cite any precedent for the contention that it need not alert this Court to its arguments. Nor does it explain why it chooses to burden the Court with locating and analyzing "common sense" arguments, rather than undertaking this task in OMB's own papers. Regardless, OMB cannot overcome this waiver; failure to raise such an argument in its summary judgment motion is fatal. *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983); *Pub. Citizen Health Research Grp. v. Nat'l Institutes of Health*, 209 F. Supp. 2d 37, 43-44 (D.D.C 2002) (stating it "highly disfavors parties creating new arguments at the reply stage that were not fully briefed during the litigation"); *Carbino v. West*, 168 F.3d 32, 34 (Fed. Cir. 1999) (noting "[t]here are cogent reasons for not permitting an appellant to raise issues or arguments in a reply brief.")

issues." Dkt. 13-10, Redacted FOIA Documents, OMB59 (e-mail from Alec French to Victoria Espinel). Second, negotiators made clear that adoption of the MoU was expressly dependent upon "buy-in by policymakers." *Id.* at OMB2 (e-mail from Howard Symons to Cary Sherman, President, Recording Industry Association of America). Third, content owners received special treatment in exchange. For example, a meeting invitation sent from Espinel to the RIAA, Motion Picture Association of America ("MPAA"), and NBC Universal cheerfully notes that the meeting falls on the birthday of one of the MPAA attendees. *Id.* at OMB49 (e-mail invitation to meeting with RIAA, MPAA, and NBC Universal). Also, NBC Universal executive Alec French communicated with Espinel via her personal Gmail account, not only her official OMB e-mail account. *Id.* at OMB59 (e-mail from Victoria Espinel to Alec French, noting "I only check my gmail intermittently now so much quicker to reach me on omb email").[7] Fourth, IPEC's participation in the negotiations appears entirely one-sided; there are no communications from the ISPs in the record analogous to those between IPEC and the RIAA and its members. Indeed, communication about the ISPs' proposals came to IPEC not from the service providers, but from RIAA member Universal Music Group. *Id.* at OMB2 (e-mail from Michael Gerson to Victoria Espinel). Lastly, IPEC has set out an explicit agenda of pushing such agreements on stakeholders in the future. *2011 IPEC Report* at 1, 5-7. Soghoian's quid pro quo argument is strongly grounded in the record.

OMB notes that in determining whether a submission is voluntary, one must examine "actual legal authority." OMB Reply 8 (quoting *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 149 (D.C. Cir. 2001)). Yet OMB overlooks exactly the context in

---

[7] In a good faith effort to narrow the scope of the dispute, Soghoian offered not to pursue material withheld under Exemption 6, such as IPEC Espinel's e-mail address in the cited e-mail. However, the nature of Espinel's address is clear from the e-mail text.

which similar information is often shared with the government: contracting. No legal authority

compels vendors to submit bids to government agencies, or to include pricing information in the

bids. They do so to obtain a benefit – being considered for a contract – in exchange for providing

information. Thus, there is no formal legal authority requiring submission, only practical

compulsion. And yet district courts in the District of Columbia uniformly treat this pricing

information as submitted involuntarily. *See, e.g., McDonnell Douglas Corp. v. Nat'l Aeronautics*

*& Space Admin.*, 895 F. Supp. 316, 318 (D.D.C. 1995) (holding "that as a matter of law the price

elements necessary to win a government contract are not voluntary"); *Martin Marietta Corp. v.*

*Dalton*, 974 F. Supp. 37, 39 (D.D.C. 1997) (stating "district court precedent in this Circuit

uniformly and firmly points to the conclusion" that pricing information is involuntarily

submitted).

Similarly, no legal authority enables the National Institutes of Health ("NIH") to obtain

information from entities such as Johnson & Johnson about sales revenues, or the royalties they

would pay to commercialize certain technologies. *See Pub. Citizen Health Research Grp. v.*

*Nat'l Institutes of Health*, 209 F. Supp. 2d 37, 43-44 (D.D.C. 2002). Such firms submit this

information by choice to NIH in exchange for commercialization rights. *Id.* at 40.

Notwithstanding the seemingly voluntary nature of this transaction, though, the information has

been treated as submitted mandatorily for FOIA purposes. *Id.* at 44-45. The issue is not whether

NIH, or any federal agency, can compel submission in the first instance. Rather, it is whether it

can condition a benefit on its provision, as Soghoian argues that IPEC conditioned its assistance

on receiving information from the RIAA and its members.

Thus, even if this Court finds that the withheld information is commercial, it should

analyze whether it is confidential under the two-part *National Parks* test, since the withheld

information was not voluntarily submitted and was publicly disclosed. *Nat'l Parks & Conservation Ass'n*, 498 F.2d at 770. OMB has failed to show either that the RIAA or its members face relevant competition, or that they face the risk of substantial competitive harm from disclosure. *See CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1152 (D.C. Cir. 1987). Accordingly, OMB must divulge these materials.

OMB adopts Sheckler's view of what constitutes actual competition in its reply brief. OMB Reply 10n.4 (citing Sheckler Supp. ¶¶5-6); *see Niagara Mohawk Power Corp. v. Dep't of Energy*, 169 F.3d 16, 19 (D.C. Cir. 1999). Sheckler's definition of competition is overly broad and unsupported by precedent. She states that "[RIAA] members also compete with those that offer, facilitate, or support the use of p2p [peer-to-peer] technologies for infringing activity." Sheckler Supp. ¶6. By this definition, the developers of the popular peer-to-peer technology The Tor Project – originally funded by the U.S. Navy and now supported by the U.S. State Department - are competitors of the RIAA and its members. Kim Zetter, *TOR Torches Online Tracking*, WIRED, May 17, 2005;[8] *Amazon cloud boosts Tor dissident network*, The Telegraph, Nov. 23, 2011.[9] By OMB's definition, anyone who has written an article advocating the use of peer-to-peer technology for infringing purposes is a competitor - including plaintiff's counsel. *See* Derek Bambauer, *Stealing the Throne*, Concurring Opinions, Feb. 22, 2012 (arguing infringement via BitTorrent is acceptable under certain circumstances).[10] According to Sheckler, all "contracting parties" with the RIAA count as competitors. Sheckler Supp. ¶5. This definition is unsupportably broad. The RIAA's coffee vendor is not a competitor. Neither are infringers. There is a difference between competition and crime.

---

[8] Available at http://www.wired.com/politics/security/news/2005/05/67542?currentPage=all.
[9] Available at http://www.telegraph.co.uk/technology/news/8910287/Amazon-cloud-boosts-Tor-dissident-network.html.
[10] Available at http://www.concurringopinions.com/archives/2012/02/stealing-the-throne.html.

Competition, under the D.C. Circuit's precedent, occurs with "meaningful day-to-day competition with businesses offering similar goods or services." *Nat'l Parks & Conservation Ass'n v. Kleppe*, 547 F.2d 673, 681 (D.C. Cir. 1976). OMB must show that the RIAA, or its members, "face *actual* competition." *Niagara Mohawk Power Corp.*, 169 F.3d at 19 (emphasis in original). OMB has adduced no evidence that RIAA, a trade organization, faces competitors who seek to purloin its members. And while members such as Universal Music Group concededly compete with one another, such competition cannot result in harm here – the members have already shared the information with one another. OMB Reply 10n.3; *see* Pl's Opposition Memo 15.

Even if OMB could show the existence of actual competition, it cannot demonstrate that disclosure would cause substantial competitive harm. This showing of impairment requires specific, direct evidence of harm that is utterly lacking here. *Niagara Mohawk Power Corp.*, 169 F.3d at 18-19; *Nat'l Parks & Conservation Ass'n*, 547 F.2d at 679. The harm must result from "affirmative use of proprietary information *by competitors*." *Pub. Citizen Health Research Grp.*, 704 F.2d at 1291n.30 (emphasis added). RIAA suggests that disclosure will impede its negotiations with future intermediaries such as ISPs. Sheckler Supp. ¶¶5-6. Even assuming this is so, there is no evidence in the record that this harm would be *substantial*. Neither OMB nor RIAA provide even a suggestion of how the scale and cost of the CAS compare to RIAA's or its members' revenues or profits, or of whether such future negotiations are anything more than speculative. Moreover, RIAA's concerns about "those that offer, facilitate, or support the use of p2p technologies," or about the risk that "those opposed to the Copyright Alert System… could unfairly and inaccurately describe and criticize the system… or take other efforts to oppose [it]" are simply not cognizable harm under the *National Parks* test. Sheckler Supp. ¶6; *United Techs.*

*Corp., Pratt & Whitney Div.*, 601 F.3d at 564 Neither the RIAA nor its members compete with

the software company BitTorrent. *See* Michael Brown, *White Paper: How BitTorrent Works*,

Maximum PC, July 10, 2009.[11] Nor do they compete with infringers. 7-11 does not compete with

shoplifters. OMB has not carried its burden under *National Parks* to show substantial

competitive harm.

Whether submitters face substantial adverse consequences is an issue of fact for this

Court to resolve. *Niagara Mohawk Power Corp.*, 169 F.3d at 18. If this Court finds that the issue

is in dispute, adversarial procedure such as discovery or a full evidentiary hearing is the

appropriate means to resolve that uncertainty. *Sears, Roebuck & Co. v. Gen. Servs. Admin.*, 553

F.2d 1378, 1382-83 (D.C. Cir. 1977) (finding summary judgment inappropriate and remanding

for adversarial proceeding); *Greenberg v. Food & Drug Admin.*, 803 F.2d 1213 (D.C. Cir. 1986)

(same). However, OMB's failure to sustain its burden to demonstrate relevant actual

competition, and substantial competitive injury, warrant granting summary judgment to

Soghoian.

OMB has not carried its burden of proving that the information withheld under

Exemption 4 is confidential: it has not effectively rebutted the evidence that the RIAA disclosed

this information sufficiently widely to consider it public; it has failed to controvert Soghoian's

evidence that the submission was compelled as a bargain to obtain IPEC assistance in

negotiations; and it has not shown either that RIAA and its members face relevant competition,

or that disclosure would substantially aid those competitors.

---

[11] Available at http://www.maximumpc.com/article/features/white_paper_how_bittorrent_works.

## II. OMB MUST DISCLOSE ALL MATERIAL WITHHELD UNDER EXEMPTION 5

Under Exemption 5, OMB withheld 3 sets of e-mail exchanges: one discussing French law regarding on-line infringement, one discussing negotiations over the MoU, and one (including draft memoranda) regarding the Joint Strategic Plan ("JSP") against counterfeiting and infringement. OMB *Vaughn* Index, OMB33-35, 37-48, 51-58.[12]

OMB has failed to meet its statutory burden for withholding these responsive materials. 5 U.S.C. § 552(a)(4)(B). OMB has not established that the withheld materials are pre-decisional. It has also not demonstrated that the French e-mail is deliberative. If the MoU e-mails are pre-decisional, they comprise "secret law" that must be disclosed. And OMB has not shown that the JSP e-mails have been properly segregated to disclose factual material.

### A. The Withheld Materials Are Not Pre-Decisional

To claim Exemption 5, an agency must show that the withheld material is both pre-decisional and deliberative. *Public Citizen v. Office of Mgmt. & Budget*, 598 F.3d 865, 874 (D.C. Cir. 2009). A "pre-decisional" document is "prepared in order to assist an agency *decisionmaker* in arriving at his *decision*." *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975) (emphasis added). Both the Supreme Court and the D.C. Circuit have repeatedly emphasized the link between an agency's decisionmaking authority and the scope of its Exemption 5 privilege. *See, e.g., Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975) (stating Exemption 5 covers "papers which reflect the agency's group thinking in the process of working out its policy and determining what its law shall be" (internal citation omitted)); *Renegotiation Bd.*, 421 U.S. at 184 (finding Board's power to make determination on excessive profits key to Exemption 5 privilege); *Jordan v. Dep't of Justice*, 591 F.2d 753, 772

---

[12] See Pl's Opposition Memo 4-5 for a table summarizing these withholdings.

(D.C. Cir. 1978) (emphasizing the "process preceding the adoption and promulgation of an agency policy"); *Senate of Commonwealth of P.R. v. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987) (holding a pre-decisional document "precedes, in temporal sequence, the 'decision' to which it relates…. a court must be able 'to pinpoint an agency decision or policy to which the document contributed' (citing *Paisley v. Cent. Intelligence Agency*, 712 F.2d 686, 698 (D.C. Cir. 1981))); *Morley v. Cent. Intelligence Agency*, 508 F.3d 1108, 1127 (D.C. Cir. 2007) (same)[13]; *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1435, 37 (D.C. Cir. 1992) (stating the "deliberative process privilege, we underscore, is centrally concerned with protecting the process by which policy is formulated" and finding withheld information must be disclosed because of its "lack of association with a significant policy decision"); *Judicial Watch v. Food & Drug Admin.*, 449 F.3d 141, 151 (D.C. Cir. 2006) (pre-decisional material must be "generated before adoption of an agency policy" (internal quotation omitted)). In other words, there is a direct relationship between an agency's capability to formulate law and policy, and its ability to claim the shield of Exemption 5. Where an agency cannot decide, it cannot withhold.

OMB argues to the contrary. OMB Reply 16-18. Defendant ignores the thrust of Soghoian's argument, however. Even if OMB need not point to a specific decision taken, or not taken, involving these documents, it must show that IPEC has some decisionmaking power to which they apply. Otherwise, they cannot be pre-decisional, and hence fall outside the scope of Exemption 5. *Morley*, 508 F.3d at 1127; *Petroleum Info.*, 976 F.2d at 1435, 37. OMB identifies

---

[13] OMB attempts to distinguish *Morley*, and other cases, by arguing that *Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1196 (D.C. Cir. 1991), clarifies *Morley*'s reasoning. OMB Reply 17. Plaintiff is at a loss to understand how *Access Reports* can clarify a case decided sixteen years later (1991 versus 2007). Regardless, decisions before and after *Access Reports* apply *Morley*'s framework. *See Paisley*, 712 F.2d at 698; *Morley*, 508 F.3d at 1127. Even *Access Reports* emphasizes "the role of the entire document in the *decisionmaking* process." *Access Reports*, 926 F.2d at 1195 (emphasis added).

no such power, because it cannot. Even the supporting declaration from the RIAA makes clear that the MoU was a "voluntary initiative" – a "contractual agreement" between content owners and ISPs. Sheckler Supp. ¶¶3, 4; *see* Dkt. 13-4, Decl. of Victoria Sheckler, ¶8 (describing "contractual negotiations to develop voluntary practices to deter" infringement). OMB is forthright about its lack of legal authority to compel the provision of information about or otherwise insert itself into the negotiations over the MoU. OMB Reply 6; Dkt. 13-5, Decl. of Victoria Espinel ("Espinel Decl."), ¶25. The statute creating the IPEC confers no authority over the negotiations of private parties. *See* 15 U.S.C. §§ 8111-8116; Pl's Opposition Memo 2, 18-19. OMB reiterates IPEC's statutory duties, but fails to explain how the withheld materials about private contractual negotiations fall within the few narrow zones where IPEC has deliberative authority. OMB Reply 12; *see Playboy Enters. v. Dep't of Justice*, 677 F.2d 931, 935 (D.C. Cir. 1982) (holding the "deliberative process privilege is … dependent upon the individual document and the role it plays in the administrative process"); *Petroleum Info.*, 976 F.2d at 1434 (stating that in assessing Exemption 5, a court must first "examine the context in which the materials are used"); *Electronic Frontier Found. v. Dep't of Justice*, 826 F. Supp. 2d 157, 167-71 (D.D.C. 2011) (describing insufficient detail of *Vaughn* index regarding role of withheld documents in decisionmaking process). OMB's suggestion that IPEC deliberates upon and decide about an Administration "response" to private negotiations not only has no basis in statute or precedent, it would cause Exemption 5 to swallow FOIA whole. OMB Reply 19. Any agency can "respond" to any issue, including ones utterly outside its purview, by putting out a press release. Such an interpretation of Exemption 5 is contrary to both the letter and spirit of FOIA. Simply put, there is nothing that OMB can decide regarding the private MoU negotiations. Thus, the withheld documents cannot be pre-decisional.

Next, OMB states that the lack of *final* decisionmaking authority does not preclude the deliberative privilege. OMB Reply 12 (emphasis added). OMB's statement is technically correct, but misleading. In the case it cites, *Murphy v. Dep't of Army*, 613 F.2d 1151, 1154 (D.C. Cir. 1979), the author of the documents did not have final decisionmaking authority – but his ultimate superior did. The issue here is whether IPEC Espinel has final decisionmaking authority in this instance. She does not. Similarly, OMB points to instances where deliberations span multiple agencies, or where subordinates disagree. OMB Reply 12-13. Again, these comparisons are inapt. OMB fails to identify another agency with decisionmaking authority over the MoU negotiations, or how that agency was assisted by IPEC, and as *Murphy* shows, subordinates' deliberations qualify for Exemption 5 only insofar as their agency holds actual decisionmaking authority. *Murphy*, 613 F.2d at 1154 (noting the "Assistant Secretary who had the decision-making power… sought advice from the General Counsel of his department on the legal questions raised").

OMB has taken a similarly capacious view of its Exemption 5 power in other circumstances, and its position has been summarily rejected by the D.C. Circuit. *Public Citizen*, 598 F.3d at 875. In *Public Citizen*, a non-profit organization sought to obtain a list of agencies that could submit materials directly to Congress without pre-clearance from OMB. *Id.* at 867. OMB initially identified only two documents, withholding both; after Public Citizen sued, it identified twenty more. *Id.* at 868. Before the D.C. Circuit, "OMB claim[ed] that because of its 'unique role and position in the Executive Branch'… its documents are 'by their nature' predecisional and deliberative." *Id.* at 874-75. The D.C. Circuit squarely rejected OMB's overbroad claims of Exemption 5 privilege: "the blanket application of Exemption 5 it seeks goes too far: carried to its logical conclusion, the argument would exempt virtually all OMB

documents from disclosure." *Id.* at 875. The appellate court's holding applies equally to OMB's unmoored claims to Exemption 5 in this case. If engaging in *any* deliberation qualified a document for Exemption 5 – even if by an agency without decisionmaking power, or where an agency could or would not identify how that document related to its authority – the "pre-decisional" requirement of Exemption 5 would be eviscerated, and the democratic safeguard functions of FOIA frustrated entirely. *See Petroleum Info.*, 976 F.2d at 1436 (noting that the pre-decisional inquiry helps cabin Exemption 5's scope). Put simply, OMB has no decision to make here – the MoU negotiations are among private parties, and IPEC can identify no authority that allows it to intervene in any way. Pl's Opposition Memo 20; *2011 IPEC Report* at 1, 5-6.

Finally, the withheld materials related to the JSP are not pre-decisional for similar reasons. IPEC makes no decisions about intellectual property policy – it merely coordinates those who do. 15 U.S.C. § 8111(b)(1)(B). Decision-making authority to develop the JSP is vested elsewhere – in an advisory committee of executive branch agencies. 15 U.S.C. § 8111(b)(3). IPEC merely chairs that committee. Its role is ministerial. 15 U.S.C. §§ 8111(b)(1)(A), (b)(1)(B); 15 U.S.C. § 8113(c). Since IPEC cannot decide, it cannot withhold.

The withheld documents are not pre-decisional, and must be disclosed.

### B. The French E-mail Is Not Deliberative

The withholding of the e-mail exchange related to French on-line infringement law suffers from the same fatal defect described above: it does not relate to any decision within IPEC's authority. French law fall does not fall within its purview. In addition, however, OMB has not shown that the document is deliberative, and the agency's characterization of the exchange has shifted over time. A deliberative document "reflects the give-and-take of the

consultative process." *Judicial Watch*, 449 F.3d at 151. The redacted portion of the e-mail,

though, is not clearly part of any "recommendation[] for policy change," or debate over "the

advisability of any particular course of action." *Public Citizen*, 598 F.3d at 875. The *Vaughn*

index first describes it as "email concerning the status of France's response to piracy issues in

order to properly characterize its approach." OMB *Vaughn* Index, OMB33. This description

portrays the e-mail as classic factual material that must be disclosed: properly describing French

law involves no decision or policy determination. *See* Pl's Opposition Memo 19-20; *In re Sealed*

*Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (noting agencies must divulge factual material even

from predecisional, predeliberative documents, unless it would "inevitably reveal the

government's deliberations"). Later, in her declaration, Espinel framed the matter differently: the

redacted material "explains to my colleagues why I asked the decision." Espinel Decl. ¶15. The

combination of the *Vaughn* characterization and Espinel's declaration strongly suggests that the

reason for asking the question was straightforward: to correctly describe French law. If this is

correct, OMB must disclose this material. *In re Sealed Case*, 121 F.3d at 737; ***Mead Data Cent.***

***v. Dep't of Air Force***, 566 F.2d 242, 260 (D.C. Cir. 1977). If it is not, these divergent

characterizations make it impossible for this Court, or Soghoian, to understand why the e-mail is

being withheld. Soghoian respectfully requests that, if this Court does not order the e-mail

disclosed, that the Court examine it *in camera* to determine whether it has been legitimately

withheld pursuant to Exemption 5.  *See Ctr. for Auto Safety v. Envtl. Prot. Agency*, 731 F.2d 16,

22 (D.C. Cir. 1984) (holding that *in camera* review of withheld documents is within the trial

court's discretion).

**C. If the MoU E-mails Are Pre-Decisional, They Constitute "Secret Law"**

If the MoU e-mail exchanges are pre-decisional, that decision must be whether and how to intervene in the private negotiations between content owners and ISPs. IPEC has not published any basis making for such decisions regarding private negotiations, nor for deciding to intervene in this particular bargaining. After all, service providers and content owners strike deals constantly in an effort to reduce on-line infringement. *See, e.g., Viacom Int'l v. YouTube*, 718 F. Supp. 2d 514, 528 (S.D.N.Y. 2010) (describing YouTube service available for fee to content owners that identified infringing material pre-emptively), *aff'd in relevant part*, *Viacom Int'l v. YouTube*, 676 F.3d 19 (2d Cir. 2012); *2011 IPEC Report* 1 (listing such negotiations in which IPEC has played a role). Even if IPEC has the authority to intervene in such private bargaining, it has not made it clear the circumstances under which it will do so, nor how it decides.

Critically, Espinel's own declaration proves that the withheld e-mails hold IPEC's reasoning for intervening here; those parameters offer guidance to other, similarly situated parties. Espinel Decl. ¶14 (noting MoU e-mails "involved issues related to *general principles* for the Administration to encourage and respond to voluntary agreements") (emphasis added). Indeed, the RIAA and IPEC both state plans for similar activities (bargaining with intermediaries, and influencing such bargaining) in the future. Sheckler Supp. ¶4 (describing "RIAA's ability to represent the commercial interests of its members in future negotiations"); Espinel Decl. ¶14; *2011 IPEC Report* 6 (stating "IPEC continues to encourage adoption of best practice agreements" and listing elements IPEC feels such agreements should include).

Thus, the "general principles" outlined in these documents constitute secret working law: they explain when IPEC will seek to influence private bargains among private sector entities

such as ISPs, content owners, and payment processors. *See 2011 IPEC Report* 6. It is settled law that such material must be disclosed under FOIA. 5 U.S.C. § 552(a)(2); *NLRB*, 421 U.S. at 137-38, 155-56 (stating "instructions to staff that affect a member of the public" must be divulged, and finding General Counsel's decisions and reasoning on when to file complaints and when to forbear are "precisely the kind of agency law in which the public is so vitally interested and which Congress sought to prevent the agency from keeping secret"); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 867 (D.C. Cir. 1980) (stating that "an agency will not be permitted to develop a body of 'secret law,' used by it in the discharge of its regulatory duties and in its dealings with the public, but hidden behind a veil of privilege because it is not designated as 'formal,' 'binding,' or 'final'"). Other ISPs, content owners, and intermediaries have a profound interest in knowing when the weight of governmental pressure may be brought to bear upon their private decisionmaking. Since OMB has not identified any public source where IPEC's "general principles" can be found, it has failed to carry its burden to show that the withheld MoU materials do not constitute secret law, even if they are pre-decisional. Thus, these e-mails must be disclosed.

### D. OMB Must Account For and Disclose Segregable Material

OMB has not met its burden to disclose all segregable factual and non-exempt information. *See* 5 U.S.C. § 522(b); *Mead Data Cent.*, 566 F.2d at 260; *Oglesby v. Dep't of Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996). OMB claims that it has met its obligation via careful review of the withheld material and provision of the *Vaughn* index, and by disclosing documents

with minimal redactions.[14] OMB Reply 21. However, OMB's statement that its redactions have been minimal is not merely inaccurate -- it is outright false, particularly regarding Exemption 5. OMB Reply 21; *but see* OMB *Vaughn* Index, OMB34, 35, 37, 38-48, 51-58 (containing heavily redacted and completely redacted materials under Exemption 5); OMB 3, 6, 7, 11, 13-14, 21, 27-29, 31, 33 (same for Exemption 4).

Moreover, there are reasons to doubt OMB's care in segregating factual material. Neither OMB nor Espinel has even addressed whether factual material is present in the withheld documents. *See Coastal States*, 617 F.2d at 867 (noting Exemption 5 "applies only to the 'opinion' or 'recommendatory' portion of the report, not to factual information which is contained in the document"); *Ryan v. Dep't of Justice*, 617 F.2d 781, 791 (D.C. Cir. 1980) (stating Exemption 5 does not apply to "factual segments which do not reveal the deliberative process and are not intertwined with the policy-making process"). Espinel carefully hedged regarding segregability in her declaration. In it, she stated that any "'factual' information is not reasonably segregable from the overall deliberative nature of these documents… the recitation of specific 'facts' in these documents itself reflects the subjective judgment of the document's author." Espinel Decl. ¶22.  OMB took the same position in its summary judgment motion, stating that "disclosure [of any factual matter] would expose OMB's decision-making process to public scrutiny," since the "facts reflect the subjective judgment of the document's author." OMB Memo 19.

---

[14] OMB also states it has met its obligation by disclosing other responsive documents to Soghoian. OMB Reply 21. It is not clear why OMB views partial fulfillment of its statutory obligations as entitling it to shirk its further duty to segregate factual material. In any case, those disclosed documents are not before this Court; the issue is whether OMB has met its burden regarding the withheld documents.

However, the D.C. Circuit has rejected precisely this argument. In *Playboy Enterprises v. Department of Justice*, Playboy sought production of a report written by the Department of Justice about the treatment of an FBI informant. *Playboy Enters.*, 677 F.2d at 933. In withholding the report under Exemption 5, the government argued that the entire report "reflect[ed] the 'choice, weighing and analysis of facts' by the task force, and is therefore protected as a part of the deliberative process." *Id.* at 935. The D.C. Circuit was unpersuaded. The Court wrote, "Anyone making a report must of necessity select the facts to be mentioned in it; but a report does not become a part of the deliberative process merely because it contains only those facts which the person making the report thinks material." *Id.* If the Department's position had held, "every factual report would be protected as a part of the deliberative process." *Id.* OMB's reliance on a discredited argument undercuts the reliability of its statements regarding segregability. OMB has failed to show with reasonable specificity why the withheld documents cannot be further segregated, and its only contention regarding the harm that factual disclosure would cause has been rejected by the D.C. Circuit. *Juarez v. Dep't of Justice*, 518 F.3d 54, 61 (D.C. Cir. 2008) (describing requirement of reasonable specificity).

OMB's sweeping assertion of justification to withhold even factual information, combined with Espinel's carefully hedged declaration, provide reason to doubt the agency's thoroughness in segregating such data. Soghoian respectfully requests that this Court review the withheld documents related to the JSP *in camera* to ascertain what factual information is contained therein, and to order OMB to disclose that information.

Lastly, OMB has not demonstrated that it has released all non-exempt material. Any material contained within the JSP e-mail exchanges that was, ultimately, incorporated into the Plan must be disclosed. OMB objects that this material does not contain "final opinions,

adjudicatory orders, or statements of policy and interpretations which have been adopted by the agency and not published in the Federal Register." OMB Reply 19-20 (internal quotation marks omitted). This cramped reading of OMB's disclosure mandate conflicts with precedent in this Circuit. *See Safecard Servs.*, 926 F.2d 1204 (rejecting similar claim by SEC); *Nat'l Labor Relations Bd.*, 421 U.S. at 153-54. Any recommendations in the JSP e-mails that are incorporated into the final product must be disclosed. *Nat'l Labor Relations Bd.*, 421 U.S. at 161; *Am. Mail Line, Ltd. v. Gulick*, 411 F.2d 696, 702 (holding memorandum incorporated into administrative decision based on agency representation must be disclosed). OMB contends that it need not "compare the contents of each discussion or draft with the final Joint Strategic Plan in order to prove that those discussions were not 'incorporated' into the final decision." In fact, that is exactly what OMB must do, and Soghoian respectfully requests that the Court so order.

## IV. IF SUMMARY JUDGMENT IS NOT GRANTED TO SOGHOIAN, DISCOVERY IS APPROPRIATE

If this Court does not grant summary judgment to Soghoian, it should provide plaintiff with the opportunity for limited discovery. While discovery is unusual in FOIA litigation, this case is also unusual: it presents a new factual situation, with the government seeking to evade scrutiny of its involvement in private bargaining that affects Internet access for millions of Americans. *Judicial Watch v. Dep't of Justice*, 185 F. Supp. 2d 54, 64 (D.D.C. 2002) (noting that "[d]iscovery is not favored in lawsuits under the FOIA"); *see* Pl's Opposition Memo 1 (describing context of suit). Moreover, the lack of discovery leaves Soghoian unable to respond to several key contentions by OMB. First, OMB claims that the MoU drafts were not publicly disclosed, despite evidence of widespread sharing among recorded music companies and leaks to the media. OMB relies on document labels ("DRAFT AND CONFIDENTIAL") to prove

confidentiality, but provides no evidence regarding how widely the materials were shared, what non-disclosure requirements were imposed, or whether an RIAA member company (rather than the organization itself) leaked the drafts to the media. Discovery will allow Soghoian to place evidence in the record to establish the level of public disclosure. Importantly, such discovery will place no burden on the government, as it will be directed entirely at the RIAA and its members.

Second, OMB claims that the RIAA and its members face substantial competitive harm if the MoU drafts are disclosed, but fails to adduce any specific evidence of such potential harm beyond conclusory allegations. Limited discovery about the financial and other impacts of the Copyright Alert System on the RIAA and member companies would bolster the record for this Court, and would provide both sides with actual data on the gravity of the alleged harm. Again, this additional evidence would come with no cost to the government.

Summary judgment for Soghoian is clearly warranted. Should this Court find summary judgment inappropriate at this point, however, discovery is necessary for Soghoian to respond adequately to OMB's contentions in its motion, reply memorandum, and supporting declarations. *See* Exhibit 1, Bambauer Declaration.

## CONCLUSION

For the foregoing reasons, the Court should grant Soghoian's motion for summary

judgment, and deny defendant OMB's motion for summary judgment. Alternatively, if this Court

denies Soghoian's motion for summary judgment at this time, it should also deny OMB's

motion, and order limited discovery to enable Soghoian to respond effectively to OMB's factual

contentions.


July 20, 2012                               Respectfully submitted,

                                            /s/ Derek E. Bambauer
                                            DEREK E. BAMBAUER
                                            Massachusetts BBO No. 660289
                                            122 Smith Street, #2
                                            Brooklyn, NY 11201
                                            Tel: (734) 748-3535
                                            Fax: (718) 780-0376

                                            /s/ Scott A. Hodes
                                            Scott A. Hodes
                                            D.C. Bar 430375
                                            Scott A. Hodes, Attorney at Law
                                            P.O. Box 42002
                                            Washington, DC 20015
                                            Tel: (301) 404-0502

                                            Attorneys for Plaintiff