**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHRISTOPHER SOGHOIAN | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. 11-2203 (RCL) |
| | ) |
| OFFICE OF MANAGEMENT AND | ) |
| BUDGET, | ) |
| | ) |
| Defendant. | ) |
| | ) |

<u>MEMORANDUM OPINION</u>

Before the Court are the parties' cross-motions for summary judgment concerning a Freedom of Information Act ("FOIA") request for records held by the Office of Management and Budget ("OMB"). ECF Nos. 13 and 14. The Court will grant summary judgment in favor of the defendant, OMB, and deny the plaintiff's motion.

**I.     BACKGROUND**

In the summer of 2012, representatives of the movie and music industries adopted measures to reduce online copyright infringement with substantial input from the Obama Administration. Pl.'s Opp'n to Def.'s Mot. for Summ. J. & Cross-Mot. for Summ. J. ("Pl.'s Opp'n") 1, ECF No. 14; Def.'s Mot. for Summ. J. ("Def.'s Mot.") 2, ECF No. 13. The OMB's Intellectual Property Enforcement Coordinator ("IPEC"), acting within her statutorily prescribed authority, contributed to the negotiations. Def.'s Mot. 1–2. These negotiations ultimately led to the voluntary adoption by private parties of a "graduated response" system, which employs a

"progressively escalating response system" that promotes legitimate use of copyrighted information and deters infringing activity. *Id.* at 2.

Plaintiff, Christopher Soghoian, submitted a FOIA request to the OMB in June 2011 seeking disclosure of documents relating to the graduated response system.  Def.'s Mot. Ex. 4, FOIA Request ("Request"), ECF No. 13-6.  Specifically, plaintiff requested:

> [C]opies of all communications, documents and notes from meetings related to discussions between the Office of the U.S. Intellectual Property Enforcement Coordinator and any federal agency, the National Cable and Telecommunications Association (NCTA), AT&T, Verizon, Time Warner Cable, CableVision, Charter Communications, Comcast, and Qwest Communications, The Recording Industry Association of America (RIAA) and Motion Picture Association of America (MPAA), and any individual record and movie studios regarding "graduated responses" to subscriber copyright infringement.

Request 1.  Plaintiff narrowed the scope of his request to "all records created between December 1, 2009 and June 22, 2011."  *Id.*  OMB responded to plaintiff's request in September 2011 by disclosing 189 pages of responsive documents while withholding sixteen pages in full pursuant to 5 U.S.C. § 552(b)(5) and portions of additional documents pursuant to §§ 552(b)(4)-(6). Def.'s Mot. Ex. 5, OMB Response ("Response"), ECF No. 13-7; Def.'s Statement of Facts, ECF No. 13.

Plaintiff filed an administrative appeal in October 2011 challenging OMB's decision to withhold disclosure of certain information under FOIA Exemptions 4 and 5.  Def.'s Mot. Ex. 6, Administrative Appeal 1, ECF No. 13-8.  In December 2011, OMB released additional portions of eighteen pages and continued to withhold only one page in full pursuant to Exemption 5, as well as portions of 59 pages under Exemptions 4, 5, and 6.  Def.'s Mot. Ex. 7, Appeal Response, ECF No. 13-9.

Plaintiff filed this action in December 2011 alleging that OMB "has wrongfully withheld agency records requested by plaintiff, and has failed to comply with the statutory time limit

under FOIA for rendering decisions on plaintiff's administrative appeal."  Compl. ¶ 20, ECF No. 1.  Plaintiff does not challenge (1) the adequacy of OMB's search for responsive documents, (2) redactions made pursuant to Exemption 6, or (3) redactions made of non-responsive material.  Pl.'s Opp'n 5; Def.'s Statement of Facts 2.  Plaintiff instead confines his challenge to OMB's decision to withhold documents under Exemptions 4 and 5.  Def.'s Statement of Facts 2.

## II.   LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment must be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (citing Fed. R. Civ. P. 56(c)).  FOIA actions are typically and appropriately resolved on summary judgment.  *See Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011).  District courts may grant summary judgment to an agency if the information provided in the agency's declarations describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith."  *Military Audit Project v. Casey,* 656 F.2d 724, 738 (D.C. Cir. 1981).

The Freedom of Information Act, 5 U.S.C. § 552, requires federal agencies to grant public access to certain records within agency control.  "FOIA is often explained as a means for citizens to 'know what their Government is up to.'"  *NARA v. Favish*, 541 U.S. 157, 171–72 (2004) (quoting *DOJ v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989)).  FOIA also provides exemptions from the disclosure requirement; these exemptions are to be

"narrowly construed." *FBI v. Abramson*, 456 U.S. 615, 630 (1982).   Exemptions 4 and 5 are relevant to this case and are described in greater detail below.

District courts review agencies' decisions to withhold records *de novo*, and agencies have the burden to justify nondisclosure of certain documents.   5 U.S.C. § 552(a)(4)(B)–(C); *Quinon v. FBI*, 86 F.3d 1222, 1227 (D.C. Cir. 1996).   Thus, the government "ultimately has the onus of proving that the documents are exempt from disclosure."   *Pub. Citizen Health Research Grp. v. FDA*, 185 F.3d 898, 904 (D.C. Cir. 1999) (internal quotations and modifications omitted).   An agency may rely on affidavits, declarations, a *Vaughn* index, *in camera* review, or a combination of these options to satisfy its burden.

A *Vaughn* index indicates what FOIA exemptions the agency claims for each withheld or redacted document and contains a justification for its decision to withhold that information. *Vaughn v. Rosen*, 484 F.2d 820, 827 (D.C. Cir. 1973).   While agency affidavits are "accorded a presumption of good faith," *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991), they must "provide[] a relatively detailed justification, specifically identify[ing] the reasons why a particular exemption is relevant and correlate[ing] those claims with the particular part of a withheld document to which they apply," *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 146 (D.C. Cir. 2006).   Further, "[i]f a document contains exempt information, the agency must still release 'any reasonably segregable portion' after deletion of the nondisclosable portions." *Oglesby v. U.S. Dep't of the Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996) (citing 5 U.S.C. § 552(b)).

Defendant's *Vaughn* index includes a Bates number for each document, the document's date, a description of the document, the relevant FOIA exemption, and a description of the information withheld.   Def.'s Mot. Ex. 1, *Vaughn* Index ("*Vaughn* Index"), ECF No. 13-3. Defendant also provided copies of each redacted document, providing some context for the

redactions.  Def.'s Mot. Ex. 8, Redacted FOIA Documents ("Redacted Documents"), ECF No. 13-10.

## III.    DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT AS TO ITS EXEMPTION 4 WITHHOLDINGS

Exemption 4 permits nondisclosure of information accurately characterized as "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4).  Information is exempt only if it (1) involves trade secrets or is commercial or financial, (2) is obtained from a person, and (3) is privileged or confidential. *See Pub. Citizen Health Research Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983). Exemption 4 balances the strong public interest in favor of disclosure against the right of private businesses to protect sensitive information. *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 768–69 (D.C. Cir. 1974).

OMB's decision to withhold portions of documents under Exemption 4 stemmed from its classification of that information as commercial, obtained from a person, and privileged or confidential.  Def.'s Mot. 5.  Plaintiff concedes that the Memorandum of Understanding ("MoU") drafts at issue were obtained from a person.  Pl.'s Opp'n 7.  Thus, the disputed issues are limited to whether the requested information is (1) commercial and (2) confidential.

OMB categorizes its Exemption 4 withholdings as drafts of the MoU, which is "a contractual agreement entered into by the Recording Industry Association of America ("RIAA") and certain of its members, the Motion Picture Association of America and certain of its members, and several leading internet service providers ("ISPs")."  Def.'s Mot. Ex. 2, Sheckler Decl. ¶ 5 ("Sheckler Decl."), ECF No. 13-4; Def.'s Mot. 4.  These seventeen documents are identified and described in the *Vaughn* index.  Defendant also notes in its *Vaughn* index that negotiating companies "were not compelled or obligated to disclose the information to IPEC."

5

*Vaughn* Index n.1.  Plaintiff counters that company submissions were not voluntary but were instead part of a "quid pro quo," where private firms shared information with the government with the hope that IPEC would "press[] ISPs for additional steps to combat copyright infringement (steps they are not legally obligated to take)" in exchange for that information. Pl.'s Opp'n 13.

### A.  The Documents at Issue Are Commercial

Commercial information withheld under Exemption 4 includes any document that "in and of itself" serves a "commercial function or is of a commercial nature."  *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002) (internal quotations and citations omitted); *see also COMPTEL v. FCC*, No. 06-cv-1718, 2012 WL 6604528, at *7 (D.D.C. Dec. 19, 2012) ("The terms 'commercial' or 'financial' in Exemption 4 . . . are construed broadly.") (internal citations omitted).  "The exemption reaches more broadly and applies (among other situations) when the provider of the information has a commercial interest in the information submitted to the agency."  *Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 319 (D.C. Cir. 2006) (citing *Norton*, 309 F.3d at 38–39).

The D.C. Circuit has held information commercial both when it was contained in reports submitted by a non-profit organization detailing its members' nuclear power plant operations, *Critical Mass Energy Project v. Nuclear Regulatory Comm'n* ("*Critical Mass I*"), 830 F.2d 278, 281 (D.C. Cir. 1987), and when third party letters sent to the Department of Commerce described strengths and weaknesses of the American lumber industry, *Baker & Hostetler LLP*, 473 F.3d at 319. Simply put, information does not need to "reveal basic commercial operations" to be designated as commercial.  *See Pub. Citizen Health Research Grp.*, 704 F.2d at 1290.

Defendant explains that the withheld portions of documents "refer to the potential costs or allocations of risk associated with the proposed Copyright Alert Program, or provide opinions or recommendations that were not included in the final agreement."  Def.'s Mot. 5–6; Sheckler Decl. ¶ 9.  The *Vaughn* index further characterizes these documents as dealing with matters such as "funding concerning the educational center and independent review process," "preliminary opinions about music consumption and proposed risk allocation," and "preliminary opinions about data disclosure and funding for the independent review process."  *Vaughn* Index 10, 16–17, 25.  These descriptions denote RIAA, MPAA, and their members' commercial interest in the withheld portions of the documents, as they reflect an allocation of costs surely to impact the commercial status and dealings of the trade associations' members.  The Court's review of the unredacted portions of the documents provided by defendant further confirms this finding.[1] Defendant has sustained its burden of demonstrating that the withheld information is commercial.  The question remains whether the information is confidential for Exemption 4 purposes.

### B.  The Documents Are Confidential

The standard of protection afforded documents withheld under Exemption 4 varies depending on whether the government agency required submission of the information or whether the information was provided voluntarily.  *Critical Mass Energy Project v. Nuclear Regulatory Comm'n* ("*Critical Mass II*"), 975 F.2d 871, 878–80 (D.C. Cir. 1992) (en banc).  For documents provided to the government voluntarily, a document is confidential "if it is of a kind that would customarily not be released to the public by the person from whom it was obtained."  *Id.* at 879.

---

[1] Indeed, the released portion of one redacted email provides context for the rest of the email's commercial nature, stating that the attached document "represents input from all of the involved ISPs, although Cox remains concerned about the indemnification provisions and overall costs of the program . . . ."  *See* Redacted Documents 3. Discussions about cost, risk allocation, and other similar negotiations pertaining to the graduated response system are commercial in nature under this Circuit's broad definition.  *See Baker & Hostetler LLP,* 473 F.3d at 319.

The D.C. Circuit emphasized that the agency bears the burden of establishing the provider's custom in order to withhold documents under Exemption 4.  *Id.*  By contrast, a mandatory submission is confidential if disclosing the information would either (1) "impair the Government's ability to obtain necessary information in the future," or (2) "cause substantial harm to the competitive position of the person from whom the information was obtained."  *Nat'l Parks and Conservation Ass'n.*, 498 F.2d at 770.

In distinguishing mandatory information from that provided voluntarily, "actual legal authority, rather than parties' beliefs or intentions, governs judicial assessments of the character of submissions."  *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 149 (D.C. Cir. 2001).  Legal authority providing for mandatory submission includes "informal mandates" that require submission "as a condition of doing business with the government." *Lepelletier v. F.D.I.C.*, 977 F. Supp. 456, 460 n.3 (D.D.C. 1997), *aff'd in part, rev'd in part, & remanded on other grounds*, 164 F.3d 37 (D.C. Cir. 1999).  In contrast, documents collected by a government agency merely to aid in "formulat[ing] effective policies" have been held voluntarily submitted for Exemption 4 purposes.  *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 337 F. Supp. 2d 146, 171 (D.D.C. 2004).

IPEC and OMB have no "actual legal authority" that requires mandatory disclosure of information from MPAA, RIAA, or their members.  *See* 15 U.S.C. § 8111(b)(1); Def.'s Mot. Ex. 3, Espinel[2] Decl. ("Espinel Decl.") ¶ 25, ECF No. 13-5.  Nor did IPEC issue any type of informal mandate as a condition for doing business with the government.  Drafts of the MoU signed by the RIAA, the MPAA, members of each association, and various ISPs had no bearing on the industry's business with the government.  Unlike other cases where awarding government contracts were necessarily based on submissions, the MoU signatories were not doing business

[2] Victoria Espinel is the current IPEC.  Espinel Decl. ¶ 1.

with the government but with each other.  As such, their submissions to the government were voluntary for Exemption 4 purposes.[3]

Since RIAA provided the documents voluntarily, the relevant test for determining their confidentiality is whether the information "is of a kind that would customarily not be released to the public by the person from whom it was obtained."  *Critical Mass II*, 975 F.2d at 879.  This assessment requires courts to evaluate "how the particular party customarily treats the information, not how the industry as a whole treats the information."  *Ctr. for Auto Safety*, 244 F.3d at 148–49.  The agency bears the burden of establishing the provider's custom in order to withhold documents under Exemption 4.  *Critical Mass II*, 975 F.2d at 879.

The Court finds the defendant has met its burden of establishing that the information provided to the government is not customarily released to the public.  Numerous statements in the sworn declarations of Victoria Sheckler, the Senior Vice President and Deputy General Counsel of RIAA, support this finding.  *See* Sheckler Decl. ¶ 2 ("[T]he information OMB is withholding, at RIAA's request . . . is of a kind that RIAA and its members customarily would not release to the public."); *id.* at ¶ 10 ("RIAA and its members do not customarily disclose preliminary contractual negotiations to the public."); Def.'s Reply Ex. 1, Sheckler Supp. Decl. ¶ 5 ("RIAA does not disclose negotiating drafts with the public, even if the final agreement is later made public."); *see also Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 337 F. Supp. 2d 146, 171 (D.D.C. 2004) (noting that "affidavits from the information providers themselves or evidence of confidentiality agreements . . . carry more weight on the custom issue") (internal citations omitted).

---

[3] In light of the Court's finding that the documents were submitted voluntarily, analysis under the alternative *National Parks* test is unnecessary.

Although plaintiff dismisses Sheckler's sworn declaration as "conclusory," he fails to substantively challenge them or point to anything suggesting that Sheckler's sworn statements are inaccurate. *See Pub. Emps. for Envtl. Responsibility v. Office of Sci. & Tech. Policy*, 881 F. Supp. 2d 8, 15 (D.D.C. 2012) (finding declaration stating that information is not the type generally released to the public sufficient to establish custom where the plaintiff provided no contrary evidence). Further, while the fact that the redacted documents are labeled "DRAFT PRIVILEGED AND CONFIDENTIAL" is not dispositive, as plaintiff points out, it certainly suggests that the documents at issue were in fact intended to remain confidential until their final version was released. Pl.'s Reply in Support of Mot. for Summ. J. & Opp'n to Def.'s Mot. 5 ("Pl.'s Reply"), ECF No. 19.

The information in the provider's affidavits and the visible designations of the drafts as privileged and confidential, taken with the government's "strong interest in ensuring continued access" to documents submitted voluntarily, *Ctr. for Auto Safety*, 244 F.3d at 148, convince the Court that the defendant has met its burden of establishing that the withheld information is not customarily released to the public.

Plaintiff alternatively argues that the information contained in the drafts at issue were publicly available. Pl.'s Opp'n 14; Pl.'s Reply 6. "To prevail on this argument, which is 'entirely distinct' from the issue of customary disclosure, 'the party favoring disclosure has the burden of demonstrating that the information sought is *identical* to information already publicly available.'" *Parker v. Bureau of Land Mgmt.*, 141 F. Supp. 2d 71, 79 (D.D.C. 2001) (quoting *Ctr. for Auto Safety*, 244 F.3d at 151) (emphasis in original). In support of his contention, plaintiff has filed a news article published approximately two weeks before the final MoU was released that provides an overview of the graduated response system. Pl.'s Reply Ex. 1, ECF

No. 19-1.   Plaintiff has failed to sustain his burden of proving that preliminary drafts of information later released publicly are identical to publicly available information.   The D.C. Circuit has held that "substantial differences in level of detail can produce a difference in type of information."   *Ctr. for Auto Safety*, 244 F.3d at 152.   The final MoU released publicly on July 6, 2011 is twenty pages long and contains an additional sixteen pages in attachments and signature pages.   Pl.'s Opp'n Ex. 1, ECF No. 14-3.   In contrast, the article allegedly representing that RIAA members leaked the MoU drafts to the press is under three pages.   A review of the article shows that it provides a cursory overview of the detail described in the final MoU and in no way indicates that the author obtained any of the draft copies at issue in this case.   The Court also finds plaintiff's request for discovery on this issue unwarranted.

In sum, the Court finds that the withheld documents and portions of documents withheld by OMB were provided voluntarily and contained confidential and commercial information entitled to protection under Exemption 4.   For the foregoing reasons, the Court grants summary judgment to the defendant with regard to those documents.

## IV.   DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT REGARDING ITS EXEMPTION 5 WITHHOLDINGS

Both parties also move for summary judgment with respect to OMB's withholdings pursuant to FOIA's Exemption 5.   OMB is entitled to summary judgment as to its Exemption 5 withholdings for the reasons set forth below.

FOIA's Exemption 5 permits the non-disclosure of "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."   5 U.S.C. § 552(b)(5).   Exemption 5 applies to "only those documents[] normally privileged in the civil discovery context."   *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975).   Protected privileges include those that qualify for the attorney-client

privilege, the attorney work product privilege, and the deliberative process privilege. *Taxation with Representation Fund v. IRS*, 646 F.2d 666, 676 (D.C. Cir. 1981) (internal citations omitted).

OMB invokes the deliberative process privilege (also referred to as the executive privilege) to justify withholding documents under Exemption 5.   The deliberative process privilege exempts from disclosure documents that are "both predecisional and deliberative." *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006).   There are three key policy purposes for this privilege: (1) to allow government employees to give superiors their "uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism"; (2) to avoid "premature disclosure of proposed policies" before they are officially adopted; and (3) "to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Coastal States Gas Corp. v. DOE,* 617 F.2d 854, 866 (D.C. Cir. 1980) (citing *Jordan v. DOJ,* 591 F.2d 753, 772–74 (D.C. Cir. 1978)). A document is pre-decisional if "it was generated before the adoption of an agency policy" and deliberative if "it reflects the give-and-take of the consultative process." *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006) (internal quotations and citations omitted).   The deliberative process protection applies to "documents reflecting advisory opinions, recommendations, and deliberations that are part of a process by which Government decisions and policies are formulated." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8, (2001) (citing *NLRB,* 421 U.S. at 150)).   The privilege does not protect purely factual material "unless the material is so inextricably intertwined with the deliberative sections of documents that its disclosure would inevitably reveal the government's deliberations." *In re Sealed Case,* 121 F.3d 729, 737 (D.C. Cir. 1997).

Plaintiff contends that OMB improperly withheld three categories of documents under Exemption 5: (1) government communications regarding the Memorandum of Understanding, (2) discussions regarding the Joint Strategic Plan, and (3) an email regarding France's law dealing with online infringement.  Pl.'s Opp'n 16.  The Court will evaluate each category of documents in turn, but will first consider two arguments that underlie plaintiff's characterizations of multiple categories of documents.  First, plaintiff agues that IPEC's decision-making and policy-setting role is narrow, meaning that its ability to withhold documents under the deliberative process privilege is very limited (and improperly exercised here).  Second, plaintiff contends that when the agency does not indicate the final decision that resulted from deliberations, the deliberative process privilege is inapplicable.

Plaintiff argues throughout his briefs that IPEC's authority to make policy is limited by the PRO-IP Act, and since it "makes few decisions and sets little policy, it is greatly limited in what it can refuse to disclose under Exemption 5."  Pl.'s Opp'n 18–19; *see also* Pl.'s Reply 15. Plaintiff boldly asserts, "[W]here an agency has no power to decide, it cannot withhold under Exemption 5."  Pl.'s Opp'n 21.  However, contrary to plaintiff's assertion, Exemption 5 has never required agencies to have final decision-making authority themselves, but instead requires only that they be part of the deliberative process along with another agency possessing such authority.  *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 188 (1975); *Bureau of Nat'l Affairs, Inc. v. DOJ*, 742 F.2d 1484, 1497 (D.C. Cir. 1984); *Blazar v. OMB*, No. 92-2719, 1994 U.S. Dist. LEXIS 21646, at *20–21 (D.D.C. Apr. 15, 1994) (holding OMB recommendations to the President pre-decisional and protected under the deliberative process privilege).  In fact, where authors lack decision-making authority, their views are more likely to be pre-decisional.  *Grumman*, 421 U.S. at 184–85.  The D.C. Circuit has noted that it would be

"inconceivable" for "Congress [to have] intended Exemption 5 to protect the decision-making processes of the Executive Branch when the decision is to be made by 'agency' officials subject to oversight by the President and not when the decision is to be made by the President himself." *Judicial Watch, Inc. v. DOE*, 412 F.3d 125, 130 (D.C. Cir. 2005).

Assuming that plaintiff is correct that IPEC has limited or no actual decision-making authority, IPEC is still part of OMB and is charged with performing numerous tasks that relate to the formulation of policy.  15 U.S.C. 8111(b)(1).  Claiming the deliberative process privilege for the documents at issue does not require OMB or IPEC to exercise direct decision-making authority, as long as they are involved in deliberations that will contribute to policy choices made by the President or agencies regarding the graduated response system.  *See Bureau of Nat'l Affairs, Inc.*, 742 F.2d at 1497 (noting "views submitted by one agency to a second agency that has final decisional authority are predecisional materials exempt from disclosure under FOIA"); *Pub. Emps. for Envtl. Responsibility*, 881 F. Supp. 2d at 16 ("[T]he fact that the draft proposal was submitted to the Working Group supports the conclusion that the document is predecisional because the Working Group itself has no decision-making authority—only its member agencies make final agency decisions.").  Although plaintiff points out that private companies contracted to form this voluntary initiative, the Administration's role in negotiations, and the importance of the issue, will certainly result in policy decisions made by the Executive branch—even if they are decisions to wait and see how the system works before implementing regulations of the industry.  *See Citizens For Responsibility & Ethics in Washington v. U.S. Dep't of Labor*, 478 F. Supp. 2d 77, 83 (D.D.C. 2007) (finding deliberations pertaining to DOL's response to a media article pre-decisional and deliberative where "DOL staff were deciding what action, if any, DOL

should take").  For this reason, IPEC's assumed lack of decision-making authority is no bar to protecting its deliberations from disclosure under Exemption 5.

Plaintiff also argues that to show a document is pre-decisional, the court must "'pinpoint an agency decision or policy to which the document contributed.'"  Pl.'s Opp'n 17 (quoting *Senate of the P.R. v. DOJ*, 823 F.2d 574, 585 (D.C. Cir. 1987) (internal citations omitted)). However, the Supreme Court has held that:

> Our emphasis on the need to protect pre-decisional documents does not mean that the existence of the privilege turns on the ability of an agency to identify a specific decision in connection with which a memorandum is prepared. Agencies are, and properly should be, engaged in a continuing process of examining their policies; this process will generate memoranda containing recommendations which do not ripen into agency decisions; and lower courts should be wary of interfering with this process.

*NLRB*, 421 U.S. at 151 n.18.  This Court and others have repeatedly held the pre-decisional prong met so long as an agency can establish "what deliberative process is involved, and the role the document at issue played in that process."  *See, e.g.*, *Judicial Watch, Inc. v. Export–Import Bank*, 108 F. Supp. 2d 19, 35 (D.D.C. 2000) (citing *Formaldehyde Inst. v. HHS*, 889 F.2d 1118, 1223 (D.C. Cir. 1989)); *Gold Anti-Trust Action Comm., Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 762 F. Supp. 2d 123, 135–136, (D.D.C. 2011) ("[E]ven if an internal discussion does not lead to the adoption of a specific government policy, its protection under Exemption 5 is not foreclosed as long as the document was generated as part of a definable decision-making process.") (citing *Petroleum Info. Corp. v. U.S. Dep't of the Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992); *Hooker v. U.S. Dep't of Health & Human Srvs.*, 887 F. Supp. 2d 40, 56 (D.D.C. 2012).  Indeed, this interpretation better serves the underlying purpose of the deliberative process privilege, in that it protects from disclosure those documents that are integral to formulating agency policy, even if the decision regarding that policy has not yet been officially adopted.

*Coastal States Gas Corp.,* 617 F.2d at 866.   This purpose is just as important when those documents constitute ongoing policy discussions as those that have since been subject to a final policy decision.   *See* Espinel Decl. ¶ 9 ("These documents and discussions on graduated response issues contribute to the basis for the Administration's approach to the protection of intellectual property rights and could inform future Administration actions.").

### A.  Email Regarding French Law

The first contested document, OMB No. 33, is "a question on the status of France's response to piracy issues."  Espinel Decl. ¶ 12.  The *Vaughn* index describes this document as an "[e]mail exchange between IPEC, OSTP, and USTR employees," dated July 16, 2010, and characterizes the redacted information as a "[p]re-decisional and deliberative question via email concerning the status of France's response to piracy issues in order to properly characterize its approach."  *Vaughn* Index 33.  Defendant further describes this document as:  "[A] single two-line email in which [the IPEC] posed a question to colleagues within the Executive Office of the President on the status of France's response to piracy issues.  OMB has released the email and redacted only the portion that explains to [the IPEC's] colleagues the reason [she] asked this question."  Espinel Decl. ¶ 15.

Plaintiff argues that this document is unprotected by the deliberative process privilege because (1) it is not pre-decisional in that "[French law] does not relate to any decision within IPEC's authority," Pl.'s Opp'n 17, and (2) it is not deliberative because "there is no subjective or political judgment involved in accurately characterizing the status of French Law," Pl.'s Opp'n 19.  Plaintiff further requests an *in camera* review in the event that the Court does not order the document disclosed.  Def.'s Reply & Opp'n to Pl.'s Mot. for Summ. J. 18 ("Def.'s Reply"), ECF No. 17.

Defendant contends the document "is predecisional because it reflects debate about an impending decision regarding the Administration's response to an ongoing policy issue." Def.'s Mot. 17.  Defendant also argues the document is deliberative because it reflects the IPEC's "mental impressions regarding an ongoing policy issue." *Id*.

The Court finds merit in defendant's decision to withhold a portion of the email.  First, the document is pre-decisional because it predated any decision recommended by the Administration through the Joint Strategic Plan or the negotiations relating to the graduated response system.   IPEC is charged with "chair[ing] the interagency intellectual property enforcement advisory committee," 18 U.S.C. § 8111(b)(1)(A), which in turn "shall develop the Joint Strategic Plan against counterfeiting and infringement," § 8111(b)(3(B).  The committee, then, makes policy judgments about how to characterize, respond, and otherwise incorporate varying opinions regarding intellectual property counterfeiting and infringement.  As chair of the committee, the IPEC's motive for requesting information about such activities is pre-decisional when made prior to the adoption of a formal decision.

Second, the document is deliberative in the simplest sense because Espinel's reason for asking a question about French law "reflects the give-and-take of the consultative process." *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006) (internal citations omitted).  It can hardly be contested that Espinel's sworn statement claiming her email "explains to my colleagues the reason I asked this question," is a mental impression protected by the deliberative process privilege.  *See Techserve Alliance v. Napolitano*, 803 F. Supp. 2d 16, 26 (D.D.C. 2011) (finding that the deliberative process privilege protects  "federal officials' notes, reports and other mental impressions") (quoting *Hornbostel v. U.S. Dep't of the Interior*, 305 F. Supp. 2d 21, 30–31 (D.D.C 2003).

The type of information contained in the redacted portion of Espinel's email is clearly described in the *Vaughn* Index and Espinel's sworn declaration.  Because the Court finds OMB's description sufficient to meet its burden of justifying its redaction of the email in question, the document was properly withheld under the deliberative process privilege of Exemption 5. Further, *in camera* review of these documents is unnecessary, as the Court is satisfied that Exemption 5 is properly invoked in this instance.  *See Ctr. for Auto Safety v. EPA*, 731 F.2d 16, 22 (D.C. Cir. 1984).  Accordingly, defendant is entitled to summary judgment on that claim.

**B.  Memorandum of Understanding**

Defendant characterizes the next category of withheld or redacted documents as that dealing with the Administration's potential response to "agreements reached between ISPs and content holders to reduce online piracy, including a discussion of a draft memorandum explaining those principles."  Espinel Decl. ¶ 13; *Vaughn* Index 34, 37–48.  These documents are what plaintiff refers to as "communications among government employees over the MoU."  Pl.'s Opp'n 16.

Plaintiff's arguments regarding the pre-decisional prong of Exemption 5 do not undermine the agency's decision to withhold this category of documents.  As noted above, an agency need not possess final decision-making authority over a particular issue to engage in the deliberative process that may ultimately lead to the adoption of a specific policy regarding that issue.  *Bureau of Nat'l Affairs, Inc.*, 742 F.2d at 1497.  It also need not identify a specific policy decision coming out of the deliberations it seeks to protect, so long as it was part of a "definable decision-making process."  *Gold Anti-Trust Action Comm., Inc.*, 762 F. Supp. 2d at 135–136 (citing *Petroleum Info. Corp.*, 976 F.2d at 1434).  The process identified by defendant and accepted by this Court is that of formulating a response to inform future policymaking regarding

the graduated response program, which does not amount merely to the creation of press releases reciting recent events, as plaintiff contends.  *See Citizens for Responsibility & Ethics in Washington*, 478 F. Supp. 2d at 83 (holding deliberations pertaining to DOL's response to a media article pre-decisional and deliberative where "DOL staff were deciding what action, if any, DOL should take").  Protecting documents pertaining to the deliberative process here serves the underlying policy objectives of avoiding disclosure of proposed policies prior to their adoption and reducing the possibility of misleading the public by disclosing documents that suggest certain reasons for a future decision that do not ultimately bear upon that decision.  *See Coastal States Gas Corp.*, 617 F.2d at 866.  The Court therefore finds defendant has upheld its burden of demonstrating that the documents containing discussions among government employees pertaining to the MoU are pre-decisional in nature.

Further, the document descriptions in the *Vaughn* index and the context provided by the unredacted portions of those documents demonstrate that the information at issue is draft material.  For instance, one email from Espinel to the "interagency group" states, "I've attached general principles for an Administration response for voluntary agreements reached . . . and an attempt to turn those principles into prose."  Redacted Documents 34.  This type of communication appears to be draft content on its face, and speaks to each of the three underlying policy considerations at issue with the deliberative process privilege.  First, maintaining the privilege will allow Espinel's working group to provide valuable feedback on her attempts to characterize the state of the situation and develop policy recommendations based on that situation without chilling the discussion based on the possible public reaction to these draft points.  *See Coastal States Gas Corp.*, 617 F.2d at 866.  Second, such communications certainly allow Espinel and her working group to bounce ideas back and forth before adopting an official

recommendation that the Administration may then choose to implement as policy. *See id.* Third, withholding the communications minimizes public confusion by "dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Id.*

The other two documents at issue in this category include an email "concerning edits to the content of a draft memo discussing agency deliberations with respect to a potential agreement between ISPs and content holders" and "[a] draft memorandum discussing agency deliberations regarding a potential agreement between ISPs and content holders." *Vaughn* Index 37–38, 39–41. Although documents identified as drafts are not automatically considered pre-decisional, *Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 257 (D.C. Cir. 1982), the Circuit has found that disclosing drafts, or "decisions to insert or delete material or to change a draft's focus or emphasis," could hamper the free exchange of ideas within agencies, *Dudman Commc'ns Corp. v. Dep't of Air Force*, 815 F.2d 1565, 1569 (D.C. Cir. 1987). Although courts must still assess an agency's characterization of information as pre-decisional and deliberative, drafts often meet these criteria. *Coastal States Gas Corp.,* 617 F.2d at 866 (finding the deliberative process privilege "covers recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency); *Judicial Watch, Inc. v. DOJ*, 306 F. Supp. 2d 58, 69 (D.D.C. 2004) (same); *People for the Am. Way Found. v. Nat'l Park Serv.*, 503 F. Supp. 2d 284, 303 (D.D.C. 2007) (finding drafts commonly protected by the deliberative process privilege). Again, the unredacted portions of the documents shed some light on the appropriateness of the agency's decision to withhold in this instance. The first document, for example, is an email exchange explicitly asking for "any other comments?" and then a revision to the "briefing memo," which is attached as the second

document and presumably incorporates those comments.  Redacted Documents 35, 34.  These documents provide more than sufficient context to conclude that the agency was utilizing the deliberative process here, participating in the exchange of ideas that have not yet been finalized into a policy that may or may not ultimately be adopted as policy.

Plaintiff alternatively argues that if the information is pre-decisional, it constitutes "'secret law' regarding how [Administration] responses are shaped."  Pl.'s Opp'n 21.  Plaintiff contends that documents discussing "appropriate and general principles" cannot be protected by the deliberative process privilege if the agency has not articulated "where these general principles can be found."  *Id.*  Plaintiff misinterprets the agency's characterization of the documents.  The very fact that Espinel asks for comments on the "general principles" she attempts to articulate suggests the agency is not operating by taking certain defined steps to "intervene in . . . private bargaining," as plaintiff argues it is, but rather is weighing its various potential options with regard to the overall policy response to such bargaining—whether that is intervention, assistance, or abstention from further participation.  The described information does not seem remotely like "instructions to staff that affect a member of the public," *NLRB*, 421 U.S. at 137–138, but instead is more akin to ideas passed back and forth about what those instructions ultimately may be.  Such information is protected by the deliberative process privilege and does not constitute secret law.  For these reasons, the Court finds the defendant properly withheld communications of government employees regarding the MoU under Exemption 5.  The Court thus grants summary judgment to defendant on that category of documents.

### C.  Emails Discussing the Joint Strategic Plan

The last contested category of documents withheld under the deliberative process privilege is comprised of emails discussing IPEC's Joint Strategic Plan ("JSP") against

counterfeiting and infringement. *Vaughn* Index 35, 51–58; Pl.'s Reply 13. According to Espinel, "employees [writing these emails] were engaging in deliberative conversations regarding draft documents in order to help determine the Administration's response to an ongoing policy issue [the graduated response program]." Espinel Decl. ¶ 14. Plaintiff argues once again that the documents are not pre-decisional because IPEC "does not have authority to craft the measure itself." Pl.'s Opp'n 22. He then contends, "[E]ven if some of the withheld materials were to qualify under Exemption 5, OMB has failed to assess—as it must—whether any of the redacted information was eventually incorporated into the final JSP, or whether any of the withheld material is factual." *Id.*

The Court once again rejects plaintiff's argument with respect to the pre-decisional nature of the documents. IPEC's limited authority to formulate policy does *not* hamper its ability to engage in deliberations related to policy adoption. *Renegotiation Bd.*, 421 U.S. at 188.

In addition to reaffirming the rulings previously announced above with regard to the information's pre-decisional nature, the Court further finds plaintiff's argument that defendant must disclose any material incorporated into the final JSP without merit. Courts have held that drafts may be withheld under Exemption 5 even if they do not substantially differ from final document versions. *See Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1122 (9th Cir. 1988) (finding that a requester's attempt to "uncover any discrepancies between . . . the draft . . . and those actually adopted" impermissibly "probe[s] the editorial and policy judgments of the decisionmakers"); *Lead Indus. Ass'n v. Occupational Safety & Health Admin.*, 610 F.2d 70, 86 (2d Cir. 1979) ("If the segment appeared in the final version, it is already on the public record and need not be disclosed. If the segment did not appear in the final version, its omission reveals an agency deliberative process [and is protected]. . . ."). Forcing the agency to identify

differences between drafts and final versions would undermine the protection afforded by the deliberative process privilege, as it would grant requesters the right to review agency employees' suggestions that are then rejected in favor of alternatives. *See Life Extension Found., Inc. v. IRS*, No. 12-cv-280, 2013 WL 171086, at *5 (D.D.C. Jan. 16, 2013) (holding a draft form and memorandum appropriately withheld and surveying Circuit precedent regarding draft documents); *Reliant Energy Power Generation, Inc. v. FERC.*, 520 F. Supp. 2d 194, 204 (D.D.C. 2007) ("An agency need not demonstrate the extent to which the draft differs from the final document because such a showing would 'expose what occurred in the deliberative process between the draft's creation and the final document's issuance.'") (quoting *Exxon Corp. v. DOE,* 585 F. Supp. 690, 698 (D.D.C.1983)).  The Court therefore concludes that defendant need not review its withholdings and disclose all draft information ultimately incorporated in some way into the final JSP.

Lastly with regard to discussions relating to the JSP, plaintiff alleges that defendant impermissibly withheld factual information that could have been segregated and disclosed.  Pl.'s Opp'n 23; Pl.'s Reply 20.  This Circuit has held that that "[p]urely factual material usually cannot be withheld under exemption 5 unless it reflects an exercise of discretion and judgment calls." *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011) (internal quotations and citations omitted).  Therefore, whether information is properly withheld "does not turn on whether the material is purely factual in nature or whether it is already in the public domain, but rather on whether the selection or organization of facts is part of an agency's deliberative process." *Id.*  Furthermore, "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).

Defendant filed a sworn declaration that information was withheld only after careful review of each line to determine whether any factual material could be segregated.  Espinel Decl. ¶ 21; *see Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776–77 (D.C. Cir. 2002) (finding factors including a line-by-line review sufficient to demonstrate all reasonably segregated material had been released).  Moreover, the *Vaughn* Index and partially redacted documents provide further context and specificity about the nature of the withheld information and make the information's deliberative nature sufficiently apparent.  *See, e.g.*, *Vaughn* Index 35 (describing email deliberations regarding "the wording and content of a draft version of IPEC's Joint Strategic Plan"); Redacted Documents 35 (containing unredacted contextual statements indicating deliberative and pre-decisional nature of emails including "[f]ollowing on from our mtg—copy of most recent version" and a response stating, "I have a few comments below, reflecting NEC's perspectives.").

Still, plaintiff contends defendant failed to identify which material is factual.  *See* Pl.'s Reply 21 ("Neither OMB nor Espinel has even addressed whether factual material is present in the withheld documents.").  However, even assuming the contested withholdings were factual, "the legitimacy of withholding does not turn on whether the material is purely factual in nature . . . but rather on whether the selection or organization of facts is part of an agency's deliberative process."  *Ancient Coin Collectors Guild*, 641 F.3d at 513.  The documents cited as examples above indicate with reasonable specificity that facts mixed in with the opinions of various government employees are intertwined with the agency's deliberative process.  *In re Sealed Case,* 121 F.3d at 737.

Based on review of defendant's declaration, *Vaughn* Index, and redacted documents, this Court concludes the defendant has shown with reasonable specificity that the withheld

information contain no segregable factual material.  *See Juarez v. DOJ*, 518 F.3d 54, 61 (D.C. Cir. 2008) (finding courts "may rely on government affidavits that show with reasonable specificity why documents withheld pursuant to a valid exemption cannot be further segregated").  While the agency retains "the burden of establishing what deliberative process is involved," *Coastal States Gas Corp.*, 617 F.2d at 868, defendant has met this burden by demonstrating that each of these documents was part of the agency's deliberative process in creating the JSP.  Because the agency has upheld its burden to establish this fact, the Court need not conduct an *in camera* review of the documents at issue.  *Ctr. for Auto Safety v. EPA*, 731 F.2d 16, 22 (D.C. Cir. 1984).  Summary judgment is therefore granted to defendant with regard to the JSP material withheld under Exemption 5.

## V.    CONCLUSION

For the foregoing reasons, OMB is entitled to summary judgment.

A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on March 26, 2013.